In re **WASHINGTON COMMUNICATIONS GROUP, INC., Debtor.**

**Landon DOWDEY, Plaintiff,**

v.

**Raymond HENRY, et al., Defendants.**

No. 80–00304.
Adv. No. 80–0058.

United States Bankruptcy Court,
District of Columbia.

Feb. 3, 1982.

Nathan Brown, Washington, D. C., for plaintiff.

Robert O. Tyler, Washington, D. C., for Trustee of Washington Communications Group Inc.

Paul Weinstein, Levitan, Ezrin, West, Weinstein, & Kerxton, Chevy Chase, Md., for defendants Capitol Publications & Kenneth Calloway.

## MEMORANDUM OPINION

ROGER M. WHELAN, Bankruptcy Judge.

(Complaint to Set Aside Stay; for Dissolution of Partnership; to Set Aside and Enjoin Transfers of Partnership Property and for an Accounting)

The individual plaintiff, Landon Dowdey, seeks, in the context of this adversary proceeding filed against the trustee in bankruptcy,[1] to establish the existence of a partnership between defendants Washington Communications Group, Inc., Plus Publications, Inc., the Estate of A. Bruce Matthews (deceased), Richard Henry and Wallace Henry—all of whom constitute the "Henry Group,"—and Landon Dowdey and certain undisclosed principals known as the "Dowdey Group."[2] The factual basis for the existence of the alleged partnership is a final "agreement" dated October 23, 1978, which, *inter alia*, provided for the extension of a $50,000 line of credit by the Dowdey Group to the Henry Group, which in turn would provide the Dowdey Group with a partnership interest in all the designated newsletters. The newsletters which comprised the sole assets of the alleged partnership[3] were managed and published by Plus Publications, Inc. (a wholly-owned subsidiary which was included in the bankruptcy petition in the Order of October 22, 1980) and were sold free and clear of all liens and encumbrances by the trustee Robert Tyler, when he liquidated the debtor's estate. These proceeds have been held in an escrow account pending the determination of the respective rights of the parties herein. The plaintiff, the Dowdey Group, claims a 26% partnership interest in the escrowed fund based on the partnership agreement of October 23, 1978, and the trustee asserts his rights to the entire proceeds by contending that no partnership ever existed.

After a review of the documentary evidence adduced by both parties and after assessing the credibility of the witnesses, the Court concludes that there was no real or meaningful intent to enter into a partnership agreement and accordingly dismisses the plaintiff's complaint with prejudice.

## FINDINGS OF FACT

The Henry Group, comprised of Washington Communications Group, Inc., Plus Publications, Inc., A. Bruce Matthews (now deceased), Richard Henry and Wallace Henry, was interested in seeking badly needed operating funds for the publication of cer-

1. The original complaint named as party defendants, in addition to the trustee in bankruptcy, the following: Raymond Henry, Washington Communications Group, Inc., Plus Publications, Inc., Richard Henry, Wallace Henry, Capitol Publications, Inc., Kenneth M. Callaway. As the result of a motion made for involuntary dismissal at the close of plaintiff's case by the defendants, Capitol Publications and Kenneth M. Callaway, the Court dismissed the complaint as to these named defendants. The principal defendant, vis-a-vis the alleged partnership is the trustee in bankruptcy for Washington Communications Group, Inc. (which also includes Plus Publications, Inc. which was consolidated by Court Order with Washington Communications Group, Inc. on October 22, 1980). The remaining named defendants did not appear in connection with the scheduled

trial hearing. *See* Pretrial Order of September 8, 1981.

2. The newsletters that comprised the basis of the alleged partnership were as follows: Day Care and Child Development Reports, Access Reports/FOI, Campaign Practices Reports, Health Labor Relations Reports, Mental Health Reports, Lobbying Reports, Handicapped Americans Reports, Election Administration Reports, PSRO Reports, Access Reports/Privacy World Weather Reports, Teacher Education Reports. *See* Agreement # 2.

3. However, two newsletters—Mental Health Reports and Handicapped Americans—were sold prior to the filing of the bankruptcy petition to defendants Capitol Publications and Kenneth Calloway.

tain designated newsletters. The actual publication of such newsletters was carried out by Plus Publications which was a wholly-owned subsidiary of Washington Communications Group. Raymond Henry was the principal officer of the debtor and was the individual actively engaged in seeking such operating funds.[4] One of the individuals contacted with reference to the financial problems was the plaintiff Landon Dowdey, an attorney who had served, off and on, as counsel to the debtor since 1975. Primary emphasis was placed on the investment incentives and advantages available to "investors." The tax benefits, which have been stressed by both parties as the raison d'etre for the agreement itself were undoubtedly substantial and an important consideration for the eventual formulation of the "Dowdey-Plus Group." [5]

After circulation of a draft agreement and after several revisions which were drafted by Raymond Henry, the agreement dated October 23, 1978, was finally entered into between the parties which provided, *inter alia*, the following:

"1. Dowdey Group will extend a $50,-000 line of credit to Henry Group, to be repaid in 90 (ninety) days.

2. Dowdey Group will assume liability for all unfulfilled subscriptions of the Henry Group for the following newsletters:

Day Care and Child Development Reports
Access Reports/FOI
Campaign Practices Reports
Health Labor Relations Reports
Mental Health Reports
Lobbying Reports
Handicapped Americans Reports
Election Administration Reports
PSRO Reports
Access Reports/Privacy
World Weather Reports *
Teacher Education Reports *
* The extent of Henry Group's interest is 50%.

3. Dowdey Group will acquire a partnership interest in all the aforementioned newsletters.

4. All losses through January 31, 1979 (or such further time thereafter as the line of credit provided for under paragraph 1 hereof is in effect) accruing under Henry Group's accrual accounting system for the aforementioned newsletters acquired by the Dowdey Group hereunder will be allocated to the Dowdey Group.

Profits will be shared 90% to the Henry Group and 10% to the Dowdey Group.

If the line of credit set out in paragraph 1 hereof is extended, at the option of the Dowdey Group, for an additional 90 days, profits will be shared 80% to Henry Group and 20% to Dowdey Group. If, at the option of both Henry Group and Dowdey Group, the line of credit is extended for a further 90-day period, that is, for 270 days in all, profits will be shared 70% to Henry Group and 30% to Dowdey Group. If, at the option of both the Henry Group and Dowdey Group, the line of credit is extended to 360 days, profits will be shared 60% to Henry Group and 40% to Dowdey Group.

5. Upon repayment in full of the line of credit provided for under paragraph 1 hereof, as it may be extended further under options provided in paragraph 4 hereof, Henry Group will have the option to buy out the Dowdey Group's interest in any newsletter acquired by them hereunder by paying in full all profits realized

---

**4.** A. Bruce Matthews, characterized by the plaintiff as the debtor's chief financial advisor and chairman of the board, was also active in the attempts and negotiations with reference to the securing of operating capital.

**5.** The tax benefits were explained in Plaintiff's Trial Brief, at 2. Ft. 2 provided that:
"The tax benefits arise out of the interrelationships of § 455 of the Internal Revenue

Code, which allows the publisher to defer recognition of prepaid subscription income until the taxable year in which the publisher delivers the periodical and § 173, which allows the publisher to deduct circulation promotional expenditures currently."
Further, the proposed 1978 partnership tax return (Form 1065) reflects an ordinary income loss of $62,975.00.

under paragraph 4 hereof to date of purchase, cancelling all obligations of the Dowdey Group to the partnership with respect to any newsletter interest bought out and, in addition, paying therefor the following percentages of the amount spent on promotion of said newsletter as to the date of purchase:

12.50%  if purchase executed after 90 days but before April 1, 1979

25%  if purchase executed on or before July 1, 1979

50%  if purchase executed on or before October 1, 1979

6. Throughout the term of this agreement, the Henry Group will undertake full responsibility for managing all newsletter publications, and will conduct all partnership activities in its own name or names. Disclosure of the partnership interest of the Dowdey Group shall only be made on a need-to-know basis and then only upon an express promise of confidentiality. Throughout the term of this agreement, Henry Group shall keep all rent payments, taxes and other obligations current. Failure of the Henry Group to maintain confidentiality or keep its obligations current shall result in the cancellation of all partnership obligations and liabilities of the Dowdey Group.

.    .    .    .    .

8. The financing provided by the Dowdey Group is related to the Henry Group's need for funds to finance the promotion of its newsletters. The assumption underlying the financial arrangement is that, on the average, newsletters are promoted 4 times a year. Thus 90 days extension of credit represents one cycle of promotions. During each cycle the $50,000 line of credit is totally utilized by direct payment of promotion expense from a special account maintained at Riggs National Bank by Landon Dowdey and A. Bruce Matthews (No. 06 13560 162). Payment of the first $50,000, having fallen somewhat in the middle of promotions already paid for and yet to be paid for, the entire $50,000

was paid directly to the Henry Group. If Dowdey Group exercises its option to extend such line of credit for an additional 90 days, promotion expense will only be paid directly from said account or to Henry Group upon vouchers. Likewise with all further extensions.

Repayment of the line of credit is also made on a 90-day basis by assignment of promotion proceeds to the Dowdey-Matthews Account designated above upon an amortization schedule, constructed by Mr. Matthews, to accomplish on a 90-day basis repayment of the entire $50,000 advance plus the amount of the minimum cash buy-out figures shown above.

It is recognized that a new promotion series is scheduled to begin in December and that, if Dowdey Group wishes to exercise its option to renew the line of credit, it must do so before December 1, 1978."

The funds called for by the agreement were in fact paid, and the parties substantially complied with the provisions of this agreement. However, in August 1979, Washington Communications Group, acting through its financial advisor, A. Bruce Matthews, wrote to Landon Dowdey and enclosed a marked up copy of the agreement. This letter stated that:

"[a]s you know, there are certain problems which are basically tax problems which were not resolved in the drafting of this agreement and I should appreciate your reviewing the marked up copy so that we can re-sign the agreement when you return to Washington."

Trustee's Ex. # 8.

No such revisions or amendments as proposed in the aforesaid letter were ever made because of an anticipated buy-out of the Dowdey Group by the Henry Group. However, the letter proposing such changes was preceded by a letter of May 16, 1979 to A. Bruce Matthews from LaVaughn T. Davis, an accountant, which stated in relevant part that:

"The gist of the problem with this Agreement is that the Dowdey Group may be *creditors*, rather than partners.

It is inconceivable that a partner be repaid all capital plus 'interest' geared to the period of time the capital is used. This makes it questionable whether the Dowdey Group is a 30% partner. It is clear that a creditor is not entitled to a share of losses from a partnership. To remedy the problem, a buy-sell clause should be considered whereby the Dowdey Group could 'put' their interest to the partnership for retirement at a predetermined price."

Trustee's Ex. # 11.

As evidenced by letters exchanged between the parties, proposals to effect a buy-out were directed to the Dowdey Group up until October of 1979. Two of the subject newsletters were in fact sold on June 7, 1980, by Plus Publications, Inc. to two of the defendants, Kenneth Callaway and Capitol Publications, and the other newsletters were later sold by the trustee free and clear of liens.

## CONCLUSIONS OF LAW

The sole issue for resolution, based on the evidence of record, is whether the "agreement" of October 23, 1978, created a partnership between the named parties. The plaintiff, Landon Dowdey, contends that a partnership occurred and relies upon an exchange of letters in June 1979, whereby the Henry Group and the Dowdey Group agreed that the October 23 agreement:

"[d]oes not grant the Dowdey Group a creditor's position but creates only a partnership position. The use of the term 'line of credit' and the phrasing of the buy-back provisions in terms of 'repayment' are clearly vestigial remnants of my prior drafts written at a time when it was contemplated that the Dowdey Group would guarantee a line of credit by American Security & Trust..."

Pl. Ex. # 5

The trustee's contention is that during the two years preceding the filing of the petition in bankruptcy, the debtor and its subsidiary were increasingly short of operating capital and were attempting to meet the problem by acquiring investor capital to be used for operating expenses, in exchange for the investors being allowed to offset operating losses on their income tax returns. The trustee further contends that the subject agreement was specifically tailored to comply with Federal tax law under which partners are able to take advantage of the partnership's net operating losses. Under Title 26 U.S.C. § 455, prepaid subscription income may be deferred until the liability for subscriptions is fulfilled.

■ The Uniform Partnership Act, 41 D.C.Code § 105 defines a partnership as: "An association of 2 or more persons to carry on as co-owners of a business for profit."

In turn, the Uniform Partnership Act in Section 7 sets forth certain criteria for the proper consideration of whether or not a partnership has, in fact, been formed. To wit, in determining whether a partnership exists 41 D.C.Code § 106(4)(A–E) provides that:

(4) The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:

(A) As a debt by installments or otherwise;

(B) As wages of an employee or rent to a landlord;

(C) As an annuity to a widow or representative of a deceased partner;

(D) As interest on a loan, though the amount of payment varies with the profits of the business;

(E) As the consideration for the sale of goodwill of a business or other property by installments or otherwise.

In determining whether or not a particular contract or transaction constitutes a partnership between the parties, the Court must ascertain the intention of the parties by reference to the entire transaction.[6]

---

6. *Cohen v. Orlove*, 190 Md. 237, 57 A.2d 810, 812 (1948); *Smith v. Smith*, 189 Md. 1, 53 A.2d 15, 19 (1947); *Beard v. Beard*, 185 Md. 178, 44

In applying these rules to the facts before us, the intention of the parties must be considered, and if the intention of the parties is to form an agreement under which the group may take advantage of a tax shelter, and the method by which the parties have planned to accomplish this end is to term the agreement a partnership agreement, the mere identification of the agreement as one of partnership will not create a partnership if the other requisites of partnership are not present. Although the best evidence for the existence of a partnership is the agreement, a written agreement designating a person as a partner has been held not to be conclusive if no partnership element is present aside from the fact that services are compensated by a share of the profits. *Fenwick v. Unemployment Compensation Commission*, 133 N.J.L. 295, 44 A.2d 172, 174–75 (1945). The wages of an employee exception to § 7 of the U.P.A. is analogous to the loan exception relevant to the facts before this Court in the context of this case. In order to constitute a partnership, the parties must have undertaken to carry on some sort of business together and to share in the profits thereof. *Minute Maid Corp. v. United Foods, Inc.*, 291 F.2d 577, 583 (5th Cir.), *cert. denied*, 368 U.S. 928, 82 S.Ct. 364, 7 L.Ed.2d 192 (1961). This community of interest in an enterprise and its result is an essential element of a partnership and requisite to the existence of the partnership relationship. *Tax Review Board v. Lou Green, Inc.*, 409 Pa. 448, 187 A.2d 572 (1963). Whether there is a contract of partnership is dependent upon whether the parties to the alleged partnership are associated in an enterprise, to the establishment of which they have contributed services or property with a community of interest in profits as profits. Partnership depends not only upon the community of interest in property and conducting the business for the community benefit of the partners, but in the joint ownership and division of profits as profits. *Fetherstonhaugh v. Moore*, 48 U.S.App.D.C. 35, 40 (1918). There is no on-going business relationship in the context of this case. True, profits are in theory shared but merely as a means of repaying the loan. This is best illustrated by the letter of LaVaughn T. Davis, an account, to A. Bruce Matthews in which he states:

> "The gist of the problem with this Agreement is that the Dowdey Group may be *creditors*, rather than partners. It is inconceivable that a partner be repaid all capital plus 'interest' geared to the period of time the capital is used. This makes it questionable whether the Dowdey Group is a 30% partner. It is clear that a creditor is not entitled to a share of losses from a partnership."

Trustees Ex. # 11.

Moreover, the following facts tend to establish that there was no bona fide intent to form a partnership within the meaning of the Uniform Partnership Act. There were never any partnership books and records maintained in the name of the "Dowdey-Plus Group," and it would appear from the evidence of record that the financial information relating to the actual publication of the newsletters was maintained by the debtor herein, Washington Communications Group, Inc. Furthermore, the "agreement" was never captioned even as a partnership agreement and more relevant to the facts of record, the agreement itself and the apparent intent of the parties was to furnish a $50,000 line of credit to Washington Communications Group by the Dowdey Group. Interestingly enough, the contention of Dowdey in his letter of June 11, 1979 (Pl. Ex. # 5) evolves only after Mr. Davis' opinion letter was transmitted to Bruce Matthews on May 16, 1979. Bruce Matthews' letter of May 1, 1979 refers specifically to a "line of credit," and the June 11, 1979 letter

A.2d 469 (1945). Intention may be shown by express agreement or inferred from their conduct and dealings with one another. *Cohen, supra; Fowler v. Loughlin*, 183 Md. 48, 36 A.2d 671, 673 (1944); *McBriety v. Phillips*, 180 Md. 569, 26 A.2d 400, 403 (1942). Substance and not name determine the legal relationship of the parties. *Seaboard Surety Co. v. H & R Construction Corp.*, 153 F.Supp. 641, 646 (D.Minn.1957), *modified on other grounds; H. C. Nelson v. Seaboard Surety Co.*, 269 F.2d 882 (8th Cir. 1959).

of Dowdey (as well as a further reply on June 22, 1979) (Pl. Ex. # 6), comes only after the referenced opinion letter of Mr. Davis. Based on the evidence of record, the Court concludes that the plaintiff's exhibits # 5 and # 6 were self-serving in that they were exchanged to correct a potentially-damaging tax situation. The facts giving rise to the agreement itself and the subsequent course of conduct between the parties clearly indicates that the initial contribution of $50,000 was a loan and that the so-called partnership agreement was designed to take advantage of the substantial losses generated for the business for tax purposes.

■■■ One who makes a loan of money or credit to the owner of a business in consideration of a share of its profits in repayment of such loan does not thereby become a partner in the business. *Cohen v. Orlove*, 190 Md. 237, 57 A.2d 810 (1948). The question of determining whether a person advancing money and sharing profits is to be considered a creditor or a partner of the firm is primarily one of the facts and ordinarily to be decided in accordance with the legal intent of the parties as determined from the terms of the whole agreement, the nature of the transaction, and the conduct of the parties. *Nelson v. Abraham*, 29 Cal.2d 745, 177 F.2d 931, 933–34 (1947); *Guthrie v. Foster*, 256 Ky. 753, 76 S.W.2d 927, 928 (1934). The Dowdey Group is a nonparticipant in the publication of the newsletters except to the extent that it is a source of funds and is able to reap a tax advantage based on the demonstrated history of losses incurred on the part of the Washington Communications Group.

■■■ The question whether an alleged loan is to be repaid is important. To constitute a loan, the money must be returnable in any event, and if it is, it constitutes a personal debt, and there is no partnership. *Rubenstein v. Small*, 273 App.Div. 102, 75 N.Y.S.2d 483 (1947). The debt here is repayable. The Henry Group must repay in full the line of credit in order to buy out the interest of the Dowdey Group. The loan was to be repaid within 90 days. There are separate provisions under which the loan

may be extended, and the amount of profits to be shared depends on the repayment schedule. However, the loan repayment does not depend on the profits made. The longer the loan is out, the higher the percentage of profits that must be forfeited—no matter what the profits are. The provisions for extension require the consent of both parties. Management is to stay in the hands of the Henry Group, and there is a separate cancellation provision if the Henry Group fails to keep current rent payments, taxes and other obligations. It seems clear the agreement wrests none of the control of the business from the Henry Group. The agreement provides for the loaning of money, not for division of management duties indicating a partnership relationship. An agreement which secures to the lender the option to receive a share of the borrower's net profits, or to receive interest on the loan never operates as a contract of partnership but at most is merely an executory contract for a partnership until the lender exercises the option of sharing the profits. *See Moore v. Walton*, 17 F.Cas. 708 (N.D. Miss.1874) (No. 9,779). In *Martin v. Peyton*, 246 N.Y. 213, 158 N.E. 77 (1927), a transaction was claimed to be a lender-borrower relationship rather than one of partnership. The party claiming the partnership relationship was a creditor of an insolvent brokerage firm that had borrowed $2.5 million worth of securities from the debtor. The Court found that no partnership had existed, though recognizing that its decision turned on a matter of degree. Three documents expressed the relationship between the lender and the borrower: the agreement, the indenture, and the option. All were executed simultaneously and intended to be one transaction. The lender loaned $2.5 million worth of liquid securities, to be returned within about two years. The loan was secured by the borrower's own speculative securities. The lender was to receive 40 percent of the profits of the firm until the securities were returned, not to exceed $500,000 and not less than $100,000. In addition, the lender was given an option to become a partner if it so desired, within about two years. The interest of the lender

was protected by two trustees. Certain restrictions were placed on the use of the loaned securities. Further, the management of the firm was to be trusted by the lender. His life was also insured. The trustees were to be kept advised as to the business of the firm, and consulted on important matters. They were permitted to veto highly speculative business but not to initiate any transaction. As further security, the partner assigned to the trustees their interest in the partnership. Profits were to be realized promptly. If the trustees thought this was not being done, they were authorized to decide this with the managing partner. In the event of disagreement, provision was made for arbitration. To protect the firm against ill-advised actions of the partners, each placed his resignation in the hands of the managing partner to become effective when the managing partner and the trustees agreed.

The Court in that decision made clear that although an intent not to be partners is relevant, the question is whether in fact they agree to so associate themselves with the firm so as to carry on as co-owners a business for profit. The Court considered some of the provisions unusual but explainable by the lender's desire for protection. The option to become a partner at a fixed time is in effect the right to share in appreciation if profits ensue, but not to share in losses. The lender need not exercise the option.

The facts before us are even more clear than those in *Peyton*. Management control remained with the Henry Group. The loan was to be paid off. We need not even look for an option to become a partner at a fixed time because we never reach the question of true losses. The higher the loss, the greater the profit because of the tax advantages. It is, in fact, the reason for the whole scheme.

In finding that a partnership does not exist, the courts have looked at a number of factors, including the existence of alternative motives other than partnership to explain a transaction,[7] and any purpose to evade a regulatory or taxing statute.[8] This is certainly present under the facts of this case and, in the Court's opinion, was the reason for the formation of the so-called partnership agreement in October of 1978.

The Court concludes, based on a review of the evidence of record that the so-called partnership was formed to take advantage of the favorable deferral of subscription income and not to carry on a business for profit. Accordingly, the Court will dismiss the plaintiff's complaint with prejudice.

---

7. *See for example, Freese v. United States*, 455 F.2d 1146 (10th Cir. 1972).

8. *See, Chaiken v. Employment Security Commission*, 274 A.2d 707 (Del.Super.1971).