Dan (Ike) **PARKER and Parker Paving, Inc.,** Appellants/Cross–Appellees,

v.

**NORTHERN MIXING COMPANY, C.J. Guthrie, Douglas Guthrie,** and **Guthrie Machinery Co.,** Appellees/Cross–Appellants.

Nos. S–1667, S–1737.

Supreme Court of Alaska.

May 27, 1988.

---

882

Peter W. Giannini, Anchorage, for appellants/cross-appellees.

Stephen J. Crispen, Kenai, and Stephanie Patel, Anchorage, for appellees/cross-appellants.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

A partnership dissolved, and the partners sued each other over the proper distribution of assets and losses. This appeal raises legal issues regarding awards of prejudgment interest and the sharing of partnership losses. The parties also challenge factual findings of the superior court concerning specific aspects of the partnership agreement, various elements of damages, and disputes over items allowed and disallowed in the final accounting.

## I. FACTS

Early in 1984, long-time acquaintances Douglas Guthrie ("Douglas") and Daniel Mark Parker, III ("Ike") discussed the possibility of operating an asphalt plant in the central Kenai Peninsula area. Ike had considerable experience in the asphalt paving business and, in 1983, had established his present business, Parker Paving Corporation ("PPC"). Douglas is employed as a salesman by Guthrie Machinery Company ("GMC"), a corporation owned by his father, C.J. Guthrie ("C.J."), which sells new and used asphalt plants and accessories.

In June 1984, Douglas, Ike, and C.J. orally agreed to purchase an asphalt plant located in Kamloops, British Columbia. After transporting the plant to Soldotna, they would commence operations to supply asphalt to PPC. The terms of this agreement are disputed. Douglas and C.J. ("the Guthries") claim that C.J. individually or through GMC would supply start-up capital for the asphalt venture (known as Northern Mixing Company or "NMC"), and that C.J.'s advance would be replaced by permanent financing provided by an institutional lender. The Guthries also claim that, pursuant to the agreement: Douglas and Ike would be equally responsible for repayments of the permanent financing and would each provide financial statements, security for his share of the financing, and a statement of work in progress; Douglas and Ike would manage NMC and each own 40% of the corporate stock; and Douglas would be paid $2,500 per month for managing the operation of the asphalt plant. Finally, they claim that C.J. was to own the remaining 20% of the corporate stock in return for securing the financing, and that Ike agreed to make available his and PPC's financial statements and to furnish real property in Oregon as security.

Ike agrees that C.J. was to secure financing for NMC and that NMC was intended to be a corporation. Ike further agrees that he and Douglas were to be responsible for the business, but he disputes any agreement that he was to provide security or any financial statements in connection with long-term financing of NMC or that Doug-

las was to receive any additional compensation for his participation in managing the business.

The superior court found that all the parties expected C.J. to be able to secure long-term financing to replace his initial investment. It found further that Ike would provide financial information to aid the financing, but that Ike's obligation to provide security arose only when a likely source of financing had been identified. The superior court also found that, although the reasonable value of Douglas's services for the period during which he worked was $2,500 per month, "there was no meeting of the minds among the principals of NMC" to pay him a salary in that or any other amount.

The asphalt plant operated for only about two months, in 1984. When the parties decided to discontinue the business relationship in the winter of 1984–85, they were not able to reach an agreement concerning the allocation of NMC's assets, profits, and liabilities.

The Guthries filed a complaint against Ike in superior court seeking possession of the asphalt plant, damages for diminution in the plant's value equal to its reasonable rental value while in Ike's possession, and an accounting of all income and disbursements of NMC.[1] C.J. (through GMC) claimed expenses of $93,477.16 incident to the original financing of NMC, of which

$84,829.09 is acknowledged by Ike as properly chargeable to NMC. Included in the $6,022.84 of disputed charges[2] are a fine and attorney's fees incurred as a result of operating the asphalt production plant without a required environmental permit, and certain credit card charges. C.J. also claimed $19,863.68 in interest on his advances, all of which Ike disputes. Ike (through PPC) in turn claimed expenses incident to operation of NMC of $151,-291.66, of which $95,413.39 is acknowledged by the Guthries as chargeable to NMC. Included in the $55,878.27 of disputed charges are trucking and equipment rental charges, land rent, approximately $22,000 for rock, certain payroll charges, and the cost of repair work—application of a "slurry coat" to a finished project—necessitated by the plant's production of some faulty batches of asphalt. PPC also owes NMC $92,320.00 for asphalt produced and sold to PPC in 1984.

The superior court found that the fine, attorney's fees, and the cost of the repair work were properly charged against the business. Pursuant to its finding that NMC, although intended ultimately to be a corporation, was a *de facto* partnership of Ike and Douglas, the superior court applied Alaska's Uniform Partnership Act, AS 32.-05.010–.430, to settle their rights and liabilities.[3] The superior court found that the

---

1. The Guthries also alleged in their complaint that PPC owed NMC for asphalt delivered in 1984, that Ike had breached fiduciary duties of fair dealing and of refraining from misappropriation of NMC's assets, and that he had breached his agreements to provide security for financing the enterprise, to obtain required permits, and to perform other services.

2. This figure, stated by the superior court, appears incorrect since $93,477.16—$84,829.09 = $8,648.07.

3. The specific provision applied by the superior court was AS 32.05.350. It provides in relevant part:
 *Rules for settling accounts following distribution.* In settling accounts between the partners after dissolution, the following rules shall be observed, subject to any agreement to the contrary:
 (1) the assets of the partnership are
 (A) the partnership property,

(B) the contributions of the partners necessary for the payment of all the liabilities specified in (2) of this section;
 (2) the liabilities of the partnership shall rank in order of payment as follows:
 (A) those owing to creditors other than partners;
 (B) those owing to partners other than for capital and profits;
 (C) those owing to partners in respect of capital;
 (D) those owing to partners in respect of profits;
 (3) the assets shall be applied in the order of their declaration in (1) of this section to the satisfaction of the liabilities;
 (4) the partners shall contribute, as provided by AS 32.05.130(1) the amount necessary to satisfy the liabilities....
Alaska Statute 32.05.130 provides in part:
 *Rules determining rights and duties of partners.* The rights and duties of the partners in relation to the partnership shall be deter-

partnership was dissolved during the winter of 1984–85 due to the parties' inability to reach an agreement for the operation of the asphalt plant in 1985. According to the superior court, neither party was at fault in causing the dissolution of the partnership since either could terminate it at will under AS 32.05.260(1)(B).[4]

The court determined that C.J. was at all material times a creditor of NMC based on his furnishing the start-up capital for the company, that he never became a shareholder because NMC never issued any stock or operated as a going business, and that although he was to share in NMC's gross returns, he was not for that reason alone a partner.[5] The superior court further found that there was no agreement by the partnership or its individual partners to pay C.J. any interest.

The superior court determined that the partnership's sole assets were the plant itself and related equipment, and the accounts receivable from PPC. Based on C.J.'s testimony, the court's valuation of

the plant was $76,887.73,[6] and the PPC receivable was $92,320.00. NMC's total asset value, including prejudgment interest of $13,625.28, was thus $182,833.01.[7] The amount owed C.J., NMC's sole creditor, was established as $88,956.40. As indicated previously, the court found that there were no agreements between Ike and Douglas concerning compensation for each other's services and concluded that, because NMC produced no profits for distribution, the only sums due the partners were for their contributions. Douglas contributed services valued at $7,500, and Ike contributed services, equipment and expenditures of $134,477.62.

The superior court's accounting for the partnership under AS 32.05.350[8] was thus as follows:

ASSETS OF NMC

| | |
|---|---|
| Plant | $ 76,887.73 |
| PPC Receivable | $ 92,320.00 |
| Prejudgment Interest | $ 13,625.28 |
| TOTAL | $182,833.01 |

AMOUNT DUE CREDITOR

| | |
|---|---|
| C.J. Guthrie d/b/a GMC | $ 88,956.40 |

mined, subject to any agreement between them, by the following rules:

(1) each partner shall be repaid the partner's contributions, whether by way of capital or advances to the partnership property and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied; and shall contribute towards the losses, whether of capital or otherwise, sustained by the partnership according to the partner's share in the profits;

(2) the partnership shall indemnify every partner in respect of payments made and personal liabilities reasonably incurred by the partner in the ordinary and proper conduct of its business, or for the preservation of its business or property;

(3) a partner, who in aid of the partnership makes a payment or advance beyond the amount of capital that the partner agreed to contribute shall be paid interest from the date of the payment or advance;

(4) a partner shall receive interest on the capital contributed by the partner only from the date when repayment should be made;

. . . .

(6) a partner is not entitled to remuneration for acting in the partnership business, except that a surviving partner is entitled to reasonable compensation for services in winding up the partnership affairs. . . .

4. Section .260(1)(B) provides:

*Causes of dissolution.* Dissolution is caused

(1) without violation of the agreement between the partners,

. . . .

(B) by the express will of any partner when no definite term or particular undertaking is specified. . . .

5. The court cited AS 31.05.020(3) [sic] in support of this conclusion. Alaska Statute 32.05.-020 provides in part:

*Rules for determining existence of partnership.* In determining whether a partnership exists, these rules shall apply:

. . . .

(3) the sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived. . . .

6. The plant's valuation was computed as follows:

| | |
|---|---|
| Value as operating plant in Soldotna | $125,000.00 |
| less 10% commission for sale | $ 12,500.00 |
| less 10% for non-operation | $ 12,500.00 |
| less freight charges | $ 23,112.27 |
| Net value of plant | $ 76,887.73 |

7. Upon motion for reconsideration, the superior court amended its original Findings of Fact, Conclusions of Law and Order to include prejudgment interest.

8. *See supra* note 3.

BALANCE AVAILABLE FOR PARTNERS' CONTRIBUTIONS $ 93,876.61

PRO–RATA DISTRIBUTION TO PARTNERS

(56.52% of Contribution)

| | |
|---|---|
| Douglas Guthrie | $ 4,960.00 |
| Ike Parker | $ 88,916.61 |

Accordingly, the net liability/recovery of the parties [9] was calculated as:

Ike Parker d/b/a PPC

| | |
|---|---|
| Prejudgment Interest | ($ 13,625.28) |
| Account Payable NMC | ($ 92,320.00) |
| Return of Contribution | $ 88,916.61 |
| Balance—Contribution | ($ 17,028.67) |

Douglas Guthrie

| | |
|---|---|
| Return of Contribution | $ 4,960.00 |

C.J. Guthrie

| | |
|---|---|
| Value of Plant | $ 76,887.73 |
| Balance Due—Cash | $ 12,068.67 |

Finally, the superior court rejected all claims of the parties against each other, except those included in the accounting. The court concluded in particular that neither party's actions support a claim for breach of any joint venture or partnership agreement since the partnership was at will and no specific agreement existed; that GMC was not a seller of goods to NMC or to either of its partners; and that the Guthries have no claim for punitive damages because Ike's conduct was not willful or malicious. Therefore, the superior court ordered:

1. Judgment for NMC against Ike in the amount of $17,028.67;

2. Judgment for Douglas against NMC in the amount of $4,960.00;

3. Transfer by NMC, Douglas, and Ike to C.J. of all rights, title and interest in the plant in satisfaction of all of C.J.'s claims (except as otherwise provided in the court's order);

4. Judgment for C.J. against NMC of $12,068.67.

The superior court also ordered each party to bear its own costs and attorney's fees based on its view that neither party "prevailed" as that term is used in Civil Rules 79 and 82.

This appeal and cross-appeal followed.

## II. DANIEL PARKER'S (IKE'S) APPEAL.

### A. *C.J. Guthrie's Status as Creditor or Partner.*

Ike contends that the superior court's conclusion that C.J. and/or GMC was not a partner in NMC is inconsistent with its findings that C.J., Ike, and Douglas intended to form a corporation in which C.J. would own 20 percent of the stock and share in the gross returns, and that NMC was operated as a *de facto* partnership rather than as a corporation. He also argues that C.J. contributed $88,956.40 to NMC, that the parties did not agree to pay him interest on the money he advanced, and that C.J.'s company, GMC, was not a seller of goods. The Guthries respond that the court's conclusion that C.J. was a creditor rather than a partner was not inconsistent with its other findings, pointing to specific evidence that C.J. was not involved in the daily operation of NMC, that he was to receive corporate stock with a corresponding limitation of liability as an owner, and that his share of profits was tied to the financing he extended to the partners. The Guthries also assert, contrary to Ike's position, that C.J. did no business in an "assumed corporate capacity" which would make him liable as a partner since the corporation never came into existence—i.e., no stock was issued and no corporate meetings were held.

**9.** In its amended findings and conclusions, the superior court did not include Douglas and C.J. in its table for "net liability/recovery of parties." It did include them in its original findings and conclusions; the figures used here were obtained by adjusting the original figures in light of the prejudgment interest awarded.

In concluding that C.J. was a creditor of and not a partner in NMC, the superior court cited AS 32.05.020(3), which states that the sharing of gross returns does not of itself establish a partnership.[10] The superior court stated that C.J.'s status as a creditor arose from his furnishing the capital necessary for NMC to acquire its plant and equipment, and specifically found that C.J. "[a]t all times ... expected the return of his investment." There is evidentiary support in the record for this finding: Douglas testified that the parties discussed possible options for repaying C.J. for the loan ("interim financing") he extended to the company and that he and Ike planned to reimburse C.J. when they obtained a loan from another source (with C.J. as guarantor) and "were to give him twenty percent of the corporation for his trouble." Ike also confirmed that C.J. was to receive twenty percent of the operation as reimbursement for getting the company started.

▮ In determining that C.J. was not a partner in NMC the superior court adhered to the general rule that an agreement to share profits alone is not conclusive evidence of the existence of a partnership. *See, e.g., Grissum v. Reesman,* 505 S.W.2d 81, 85–86 (Mo.1974); *Ramirez v. Goldberg,* 439 N.Y.S.2d 959, 961 (N.Y.App.Div.1981); *Gutierrez v. Yancey,* 650 S.W.2d 169, 172 (Tex.App.1983); *True v. Hi–Plains Elevator Mach., Inc.,* 577 P.2d 991, 997 (Wyo. 1978). Moreover, numerous courts have indicated that one who makes a loan to the owner of a business in consideration of a share of its profits as repayment of the loan does not thereby become a partner in the business. *See, e.g., Dowdey v. Henry (In Re Washington Communications*

*Group, Inc.),* 18 B.R. 437, 444 (Bankr.D.D.C.1982); *Smith, Landeryou & Co. v. Hollingsworth,* 251 N.W. 749, 755 (Iowa 1933); *Cohen v. Orlove,* 190 Md. 237, 57 A.2d 810, 812 (App.1948); *Meisinger v. Johnson,* 162 Neb. 360, 76 N.W.2d 267, 271 (1956); *Greenstone v. Klar,* 69 N.Y.S.2d 548, 551 (N.Y.App.Div.1947); *Kirshon v. Friedman,* 349 Pa. 171, 36 A.2d 647, 650 (1944); *Dillard v. Wholesale,* 286 S.W.2d 675, 677 (Tex.App.1956); *Koesling v. Basamakis,* 539 P.2d 1043, 1045 (Utah 1975). *See generally* AS 32.05.020(4), *supra* note 10; 68 C.J.S. *Partnership* § 20(c)(3), at 437 (1950). In general, an advance of funds is a loan (and thus does not indicate the creation of a partnership relation) if its repayment is not contingent on the profits of the enterprise; if repayment is contingent on profits, it tends to demonstrate the existence of a partnership because the funds are risked in the business rather than being made the personal responsibility of the borrower. *May v. Sexton,* 206 P.2d 573, 575 (Ariz. 1949); 68 C.J.S. *Partnership* § 20, at 437–38 (1950); *see also Dowdey,* 18 B.R. at 444; *Rubenstein v. Small,* 273 A.D. 102, 75 N.Y.S.2d 483, 485–86 (N.Y.App.Div.1947) (to constitute a loan, money must be returnable in any event; if it is, it is a personal debt and there is no partnership). Evidence of a party's liability for losses of the enterprise weighs in favor of the existence of a partnership, while evidence of the absence of such liability tends to show that the parties intended the transaction to be a loan.

▮ Considering both the "clearly erroneous" standard of review that applies to the superior court's determination that C.J. is not a partner of NMC,[11] and the evidence

---

**10.** Alaska Statute 32.05.020 further provides: "(4) the receipt by a person of a share of the profits of a business is prima facie evidence that the person is a partner in the business, but this inference may not be drawn if the profits were received in payment (A) as a debt ... [or] (D) as interest on a loan...."

**11.** Findings of fact will not be set aside unless clearly erroneous. Alaska R.Civ.P. 52(a). Whether a partnership exists in a given case is normally a question of fact for the fact finder. *Peterson v. Prince,* 102 Ill.App.3d 220, 58 Ill.Dec.

355, 430 N.E.2d 297, 300 (Ill.App.1982); *Pruitt v. Fetty,* 148 W.Va. 275, 134 S.E.2d 713, 716 (W.Va. 1964). Determining whether a person advancing money and sharing profits is to be considered a creditor or a partner of the firm is primarily a question of fact and ordinarily to be decided in accordance with the legal intent of the parties as ascertained from the terms of the whole agreement, the nature of the transaction, and the conduct of the parties. *Dowdey,* 18 B.R. at 444. Furthermore, with respect to whether certain parties are partners in a business, their characterization of the relationship as one of

concerning the parties' intended relationship, we affirm the superior court's ruling on this issue. As noted above, testimony at trial indicated that C.J.'s role was to provide interim financing for the business; there was no question that he would be repaid for this contribution; he was not to be liable for NMC's liabilities; and finally, the parties did not contemplate that he would exercise any management or control function with respect to NMC's operation. The superior court's ruling that C.J. was not a partner is thus amply supported by the record.

### B. *Douglas's Contribution of Services.*

■ Ike contends that the superior court erred in crediting Douglas for a partnership contribution of $7,500 in services. He argues that such credit is contrary to the court's express finding that, although Douglas worked full time running the asphalt plant for approximately three months in 1984 and the reasonable value of his services was $2,500 per month, "there was no meeting of the minds among the principals of NMC that he be paid a salary in that or any other amount."

In *Schymanski v. Conventz*, 674 P.2d 281, 284–85 (Alaska 1983), this court distinguished between non-cash capital contributions to a partnership and remuneration for ordinary services:

> The general rule is that, in the absence of an agreement to such effect, a partner contributing only personal services is ordinarily *not* entitled to any share of partnership capital pursuant to dissolution. Personal services may, however, qualify as capital contributions to a partnership where an express or implied agreement to such effect exists. . . .
>
> To be distinguished from non-cash capital contributions to a partnership is compensation or remuneration for a partner's personal services performed in the

course of day-to-day affairs of the partnership. In the absence of an agreement to provide for such compensation, remuneration for a partner's services performed in the course of partnership affairs is prohibited by statute.[12]

(Citations and footnotes omitted.)

In light of *Schymanski*, it seems clear that the superior court meant, by its finding that no meeting of the minds occurred regarding payment of any *salary* to Douglas, that the parties entered no agreement that would lift the section .130(6) proscription against compensation for acting in the partnership business. That does not, however, necessarily answer the question of whether the court found an express or implied agreement that Douglas's services would qualify as capital contributions to the partnership. Douglas argues that the superior court could reasonably have found such an implied agreement since he was to operate the plant full time, whereas Ike had other employment and income.

The superior court made no specific finding as to the existence of an agreement to treat Douglas's services as capital contributions. The court did, however, find that

> [t]here were no agreements between the partners for compensation for either's services. There are no profits to be distributed. Consequently the only sums due the partners are with respect to their contributions.

The superior court then proceeded to find that Douglas "contributed services to the joint venture in the amount of $7,500," and that Ike "contributed services, equipment and expenditures" totalling $134,477.62. From these findings collectively, it could be inferred that the superior court found an implied agreement between Douglas and Ike that their services would constitute capital contributions to NMC. Given the foregoing, however, we conclude that the question of the existence or non-existence

---

partnership or not is not controlling; their intent may be inferred from their actions. *See Greene v. Brooks*, 235 Cal.App.2d 161, 45 Cal. Rptr. 99, 102 (Cal.App.1965); *Anderson Hay and Grain Co. v. Dunn*, 81 N.M. 339, 467 P.2d 5, 7 (N.M.1970); *Taylor v. Lewis*, 553 S.W.2d 153, 158 (Tex.App.1977).

12. Alaska Statute 32.05.130(6) provides, with an exception not here relevant, that subject to any agreement between the partners, no partner is entitled to remuneration for acting in the partnership business.

of such an agreement should be remanded to the superior court for explicit findings of fact as to whether it was agreed that Douglas's services would constitute capital contributions.

### C. *Prejudgment Interest on Value of Asphalt Delivered to PPC.*

The superior court found that PPC owed NMC $92,320.00 for asphalt purchased in 1984. The court's initial computation did not include prejudgment interest on this amount, but upon Douglas and C.J.'s motion for reconsideration, the court amended its findings and conclusions to include prejudgment interest in NMC's total asset value. The superior court articulated no explanation for the award of interest, but the award ($13,625.28) was based on a rate of 10.5% from November 1, 1984.

Ike contends that the interest award is unjust given that PPC received asphalt worth $92,320.00 after paying a total of $100,929.34 for the raw materials used to produce it and that the parties allegedly agreed to treat any advances made by PPC as an offset against its debt for the asphalt. Ike thus argues that PPC owed NMC no debts on which interest could accrue. The Guthries respond that the interest award was proper because PPC's debt for the asphalt was due at the end of the season, in November 1984, whereas Ike was entitled to return of his capital contribution (including the expenditures for the raw materials) only after all liabilities of the partnership had been satisfied upon dissolution. They point out that if PPC had paid its debt when due, NMC could have used that income, as the parties had contemplated, both to pay its debts and to repay the partners for their investments over the course of several operating seasons.

■ This court has held that the purpose of awarding prejudgment interest is "to compensate the successful claimant for losing the use of the money between the date he or she was entitled to it and the date of judgment." *Bevins v. Peoples Bank & Trust Co.*, 671 P.2d 875, 881 (Alaska 1983); *American Nat'l Watermattress Corp. v. Manville*, 642 P.2d 1330, 1343 (Alaska 1982). Here the superior court determined, implicitly if not explicitly, that NMC was entitled to be paid for the asphalt sold to PPC in November 1984. Ike has failed to demonstrate the injustice necessary to support a denial of prejudgment interest. *See Farnsworth v. Steiner*, 638 P.2d 181, 184 (Alaska 1981). The amounts which the court found PPC paid for raw materials, cited by Ike as offsetting the amount due on which the interest was calculated, were the amounts allowed by the court as part of Ike/PPC's capital contributions to the partnership. Partners are entitled to repayment of their contributions only *after* other liabilities of the partnership (i.e., those owing to creditors other than partners and to partners other than for capital and profits) are satisfied. *See* AS 32.05.130(1), .350; *Cutler v. Bowen*, 543 P.2d 1349, 1352 (Utah 1975). Thus we conclude that Ike cannot justifiably claim that the award of prejudgment interest is improper by asserting a right to offset the debt to the partnership due in 1984 with return of his contribution from the partnership not due him until 1987. We therefore affirm the award of prejudgment interest.

### D. *Sharing of Partnership "Losses".*

■ Ike contends that it necessarily follows from the "undisputed evidence" that the parties agreed to share partnership profits equally that they also agreed to share losses equally. Accordingly, he argues, the superior court erred in allocating NMC's liabilities between the parties based on the amounts of their respective capital contributions. We reverse the superior court's determination of the repayment of capital contributions.

The capital account of a partnership is, by definition, the difference between its assets and liabilities. The partnership had total assets of $182,833.01. From this amount $88,956.40 was due to its sole creditor, C.J. Guthrie. The partnership's remaining assets thus totaled $93,876.61.[13]

13. $182,833.01 Assets
 ($ 88,956.40) Debt to C.J.

 $ 93,876.61 Remaining assets

Each partner made the following contributions to capital:

| | | |
|---|---|---|
| Parker | — | $134,477.62 |
| Guthrie | — | $ 7,500.00 [14] |

Total Capital — $141,977.62

Since only $93,876.61 in partnership assets remained after paying C.J., the partnership capital account suffered a loss of $48,101.01.[15]

Since there was no agreement to the contrary, AS 32.05.130(1) [16] determines the division of this loss between the parties: "each partner ... shall contribute towards the losses, whether of capital or otherwise ... according to the partner's share in the profits." Since the partners agreed to share profits equally the loss sustained by the partnership capital account should be shared equally. Thus: $48,101.01 ÷ 2 = $24,050.50.

Guthrie's capital account:
$ 7,500.00 Capital contribution
($24,050.50) ½ of loss

($16,550.50)

Parker's capital account:
$134,477.62 Capital contribution
($ 24,050.50) ½ of loss

$110,427.12

Guthrie must therefore pay $16,550.50 to the partnership. When he makes that payment his capital account will be zero, the net assets of the partnership will be $110,427.12, and Parker's capital account will remain at $110,427.12.[17]

In view of the foregoing we reverse the superior court's pro rata repayment of capital contributions.

## III. GUTHRIES' CROSS–APPEAL

A. *Rental Value of Asphalt Plant as Damages for Ike's Alleged–Wrongful Possession of Plant.*

 The Guthries contend that the superior court denied their claim for rental value of the asphalt plant as damages for Ike's wrongful possession of the plant based on an erroneous finding of fact and that they are therefore entitled to such damages.[18] The contested finding reads as follows:

> During the summer and fall, 1985, the asphalt plant was in physical possession of PPC, pursuant to court order.[19] The parties expected the plant would be producing asphalt during this period. However, the plant did not operation [sic] because the required water discharge permit had not been obtained.

The Guthries argue that the evidence demonstrated that Ike could have legally operated the plant with the proper permits during all of the 1985 season, that he failed to put the plant to productive use, and that the plant lost value while in his possession.[20] They further contend that the court

14. This amount is disputed and in accordance with this opinion is remanded for further findings.

15.

$141,977.62 Capital contributions
($ 93,876.61) Capital remaining

$ 48,101.01 Capital account loss

16. *See supra* note 3.

17. In other words Guthrie must pay $16,550.50 to NMC, rather than receive back $4,960.00.

18. The court did not make a specific finding on Douglas and C.J.'s claim for rental value of the plant for the 1985 season, but evidently included it within its holding that "[n]either party's

claims against the other except included in the partnership accounting is sustained."

19. Prior to trial, the Guthries filed a motion for sequestration and sale of the plant in an apparent attempt to prevent Ike from operating the plant for his personal gain. On May 21, 1985, the superior court ordered that "neither party make any further liens, encumbrances, sales, partial sales or in any way remove or alter any portion of the plant, except insofar as is necessary for [its] ordinary operation," and that any operation of the plant by Ike be accounted for, i.e., that Ike would furnish the Guthries with an accounting of expenditures and revenues related to the operation. The court also ordered Ike to provide security and insurance on the plant.

20. At the hearing on the motion for sequestration, the Guthries essentially alleged a loss of value based on the plant's dormancy during the 1985 season, purported evidence that parts had

by its decision "ultimately found that [Ike] had no rightful claim to possession,"[21] of the plant and that they are entitled to its rental value as an appropriate measure of damages for the period of his wrongful possession.

Ike responds that the superior court did not require him to operate the plant during the 1985 season but merely allowed him to do so subject to strict accounting requirements; that he was unable to obtain the requisite permits until August 1985 and did not operate the plant during that season; and that the documentary evidence on which the Guthries base their assertion that the plant was properly permitted refers not to the water discharge permit described by the court but to another permit, for air quality control, required by the state.

Ike testified on direct examination that he did not receive permission from the Alaska Department of Environmental Conservation ("DEC") to operate the asphalt plant until mid–August of 1985. On cross-examination, he acknowledged that he received DEC permission on July 17 but did not commence operation because he had no contracts to fulfill at that time. Ike further testified that he did not operate the plant at all because by the time he notified DEC of his intent to operate as of September 9—which notice is required once permission is granted—PPC's paving contracts had been completed with asphalt obtained from other sources. Moreover, Ike is correct that the evidence cited by the Guthries to buttress their argument pertains only to the issuance of an air quality control permit for the plant and thus does not contravene the court's finding that no water discharge permit had been obtained.[22]

▮ We conclude from the foregoing that the superior court's finding was not clearly erroneous.[23] Even if, contrary to the court's findings, both of the required permits were timely obtained so that Ike could have operated the plant during the 1985 season, the Guthries would not have a viable claim for damages. As Ike points out, the court's pre-trial order did not require him to operate the plant, so his failure to operate it cannot be deemed wrongful on that basis. Further, as previously noted, the Guthries do not explain their assertion that the court "ultimately found" Ike's possession to be wrongful.[24]

been removed from it, its depreciation, and adjustment for present value of its worth.

21. The Guthries do not specify what part of the superior court's decision implied that Ike's possession was wrongful but merely state that either (1) he had no partnership rights in the plant or (2) had no right as against the true owner, C.J., whose loan was secured by the plant. *See also infra* note 24.

22. Exhibit 15 contains DEC applications for both an air quality control permit and a wastewater discharge permit. However, Exhibit 26 consists of a July 17, 1985 letter from DEC to Ike granting only the air quality control permit, and neither indicates the final outcome on the wastewater permit application. Exhibit 15 also contains a June 10, 1985 letter from DEC requesting Ike to furnish additional information necessary to its decision on the wastewater permit and advising him that failure to provide such information could result in denial of the application.

23. A clearly erroneous finding is one which leaves this court "with a definite and firm conviction on the entire record that a mistake has been made, although there may be evidence to support the finding." *Mathis v. Meyeres,* 574 P.2d 447, 449 (Alaska 1978) (quoting *Frontier Saloon v. Short,* 557 P.2d 779, 781–82 (Alaska 1976)). In determining whether such a mistake has been made, the court must "take the view of the evidence most favorable to the prevailing party below." *Id.* (quoting *Graham v. Rockman,* 504 P.2d 1351, 1353–54 (Alaska 1972)).

24. Even assuming that the challenged finding was erroneous, the Guthries cite no legal grounds for recovery to substantiate their asserted entitlement to rental value damages. They rely solely on *Wright v. Vickaryous,* 598 P.2d 490, 499 (Alaska 1979), in which this court held that reasonable rental value of the subject property is an appropriate measure of the damages recoverable by a landowner from a holdover tenant. They make no argument as to how the facts here present an analogous "holding over" by Ike. In our view, Ike cannot be charged with wrongful possession of the plant during the 1985 season because the superior court had not yet determined the parties' respective rights vis-à-vis the partnership and its assets, and the court's pre-trial order, treating the motion for sequestration "in the nature of a potential partnership dissolution," effectively authorized Ike's possession of the property. At trial, the Guthries claimed rental value damages due to Ike's alleged breach of fiduciary obli-

B. *Final Accounting.*

### 1. PPC Receivable.

■ The Guthries argue that the superior court erred in basing its determination of the amount of NMC asphalt which PPC purchased on the number of square feet paved. They assert that a more accurate measure is the amount of liquid asphalt purchased because only NMC could use the liquid asphalt (whereas PPC's other records commingled NMC and other PPC accounts) and thus that amount was not disputed. The Guthries contend that the superior court should not have accepted the paving figures based on other PPC jobs without requiring Ike to meet a heightened burden of proof on this issue, because the evidence lay peculiarly within his control.

The Guthries cite no authority for their assertion that "there was some cause to suspect that the [PPC] 'job' accounting was not accurate." The court found, as Ike contended, that 2,632 tons of asphalt had been produced. Douglas and C.J. claimed that the figure was over 3,000 tons, in spite of Douglas's failure to controvert an exhibit indicating that he reported production of only 2,101 tons to DEC.

■ In order to resolve this disputed point of fact, the superior court necessarily had to choose between directly contradictory assertions of fact and, apparently, found Ike's position better supported by the evidence and/or more credible. On appeal, the Guthries have referred to no evidentiary support for their position other than that which was before the superior court, and have essentially argued that the trial court made a mistake simply because

it did not accept their position. The amount of asphalt purchased by PPC clearly presents a question as to which there is room for diversity of opinion among reasonable people, and is accordingly one for the trier of fact. *See Levar v. Elkins*, 604 P.2d 602, 604 (Alaska 1980). Moreover, it is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence.[25] *Associated Eng'rs & Contractors v. H & W Constr. Co.*, 438 P.2d 224, 227–28 (Alaska 1968); *see also Penn v. Ivey*, 615 P.2d 1, 3 (Alaska 1980). Therefore, we affirm the superior court's resolution of this issue.

### 2. Schedule 48.

The Guthries also contend that the superior court erred in allowing four particular items claimed by Ike as contributions to NMC. Specifically, they dispute the allowances of (1) $7,614.84 for a "slurry seal," a repair made necessary due to several faulty batches of asphalt produced by the plant;[26] (2) $1,860 for costs of transporting the asphalt plant by truck from Anchorage to Kenai; (3) $6,109.50 for the use of PPC trucks and drivers to transport the rock; and (4) $51,605.97 for the cost of the rock itself.

The superior court's determination that Ike contributed these amounts to NMC consists of factual findings which as noted previously are subject to the "clearly erroneous" standard of review. The record reveals that the parties presented conflicting evidence as to the proper amount chargeable to NMC for each of these items in the partnership accounting, and it con-

gations and AS 32.05.200(b)(1) by his failure to operate the plant. (AS 32.05.200(b)(1) provides that subject to a contrary agreement between the partners, a partner "has an equal right with the partners to possess specific partnership property for partnership purposes, but the partner has no right to possess the property for any other purpose without the consent of the partners.") The superior court ultimately found that "[n]either party's claims against the other except [as] included in the partnership accounting is sustained," concluding in particular that "neither party's actions support a claim for breach of any joint venture or partnership agreement." Thus, the court implicitly rejected these arguments.

**25.** The trial court's determination with respect to credibility of witnesses and weighing of conflicting evidence may be reversed only if it is clearly erroneous. *Penn v. Ivey*, 615 P.2d 1, 3 (Alaska 1980). As noted above, for a finding to be clearly erroneous, it must leave this court with the definite and firm conviction that a mistake was made, although there may be evidence to support the finding. *Olsen & Sons Logging, Ltd. v. Owens*, 607 P.2d 949, 952 (Alaska 1980).

**26.** In their brief, the Guthries assert that the amount allowed was $7,614.84 and apparently derive this figure from Schedule 48 Nos. 13(b), 15, and 18 ($3,460.00 + $576.00 + $3,578.84).

tains sufficient evidence supporting the amounts allowed by the superior court. Thus we conclude that none of the questioned findings are clearly erroneous.

### C. *C.J.'s Entitlement to Interest.*

The Guthries contend that the superior court erred in failing to award C.J. interest on the money he advanced to NMC based on its finding that the parties did not agree that he should receive such interest.[27] They argue that C.J. is entitled to interest based on a provision for interest in the Memorandum Agreement to which Ike voiced no objection. They also argue that C.J. is entitled to interest under a theory of equitable estoppel by virtue of Ike's failure to inform Douglas and C.J. of any objections to the Memorandum Agreement.

Resolution of this issue is controlled by our recent decision in *Merdes v. Underwood,* 742 P.2d 245 (Alaska 1987). There we said in part:

> On remand, the superior court should note that a debtor may be charged interest for the withholding of the amount due when that amount is ascertainable.... Interest is a standardized form of compensation to the injured party for the loss of the use of what should have been paid. Restatement (Second) of Contracts § 354 comment a. "It is payable without compounding at the rate, commonly called the 'legal rate,' fixed by statute for this purpose." *Id.* "Interest is not payable as damages for non-performance until performance is due." *Id.* comment b.
>
> ....
>
> Accordingly, the superior court should employ the following analysis on remand. If the court finds that there was an agreement not to pay interest on the debt, then Merdes is not liable for any interest. If it finds that there was no agreement not to pay interest ... then it should impose the statutory rate of interest from the date it determines the debt was due.

*Id.* at 250–51 (footnotes omitted). In light of *Merdes* we hold that this issue concerning interest should be remanded to the superior court with directions to employ a similar analysis in making appropriate findings of fact and disposition upon remand.

### D. *Breach of Fiduciary Duty.*

Douglas and C.J. claim that Ike violated his fiduciary duties as a partner by, *inter alia,* taking advantage of NMC business opportunities for his personal (PPC's) gain, by failing to advise them about expenditures chargeable to NMC which PPC made, and by failing to use partnership property for NMC's benefit. They allege in particular that

(1) Ike misrepresented the amounts of rent owed by NMC (and thus attempted to overcharge the business) for the land on which the asphalt plant was situated, and also charged NMC rent for use of a PPC loader which exceeded the loader's depreciated cost, and for a period longer than NMC's actual use of the loader, when he should have purchased the loader for NMC;

(2) Ike failed to notify them of various—allegedly improper—expenses claimed by PPC until after the 1984 season despite C.J.'s request for an accounting, and failed to maintain separate accounts and records for PPC and NMC;

(3) Ike failed to obtain the necessary DEC operating permits for the 1984 season despite his knowledge that Douglas and C.J. were relying on him to do so and misrepresented his relationship to the business to DEC such that Douglas was held responsible for the permit violations; and

(4) Ike failed to operate the plant or otherwise utilize it for NMC's benefit during the 1985 season and also failed to provide security and insurance as directed by the court during the period of his possession.

As previously noted, the superior court denied the Guthries' claims for breach of

---

**27.** In addition to its finding that the parties did not agree to pay C.J. any interest, the court found that he expected repayment of the money he advanced, that he was to share in NMC's gross returns, and that NMC generated no profits for distribution.

fiduciary duties by its holding that "[n]either party's claims against the other except [as] included in the partnership accounting is sustained." In regard to the particular allegations detailed above, the court allowed Ike to charge NMC rent for the land only in the amounts indicated by the written lease agreement (which the Guthries do not dispute) and rent for the loader only insofar as the Guthries did not dispute the charge. The court made no findings concerning Ike's alleged obligations to inform the Guthries concerning partnership expenses and to maintain separate accounts.[28] It did find specifically that Douglas and Ike agreed to operate the plant in 1984 despite notice from DEC that the plant lacked a required permit, and that the fine and attorney's fees paid incident to the resulting criminal charges were properly assessed against NMC. Finally, the court attributed Ike's non-operation of the plant during 1985 to the lack of a required permit but did not find Ike blameworthy in this respect.

The Guthries invoke *Mathis v. Meyeres*, 574 P.2d 447 (Alaska 1978), as authority for their position that Ike breached his fiduciary responsibilities to them and to NMC. In *Mathis* this court endorsed application of the law concerning the fiduciary relationship of corporate officers and directors to their corporation to the partnership relation:

> Out of this relationship arises the duty of reasonably protecting the interests of the corporation. It is inconsistent with and a breach of such duty for an officer or director to take advantage of a business opportunity for his own personal profit when, applying ethical standards of what is fair and equitable in a particular situation, the opportunity should belong to the corporation. Where a business opportunity is one in which the corporation has a

legitimate interest, the officer or director may not take the opportunity for himself. If he does, he will hold all resulting benefit and profit in his fiduciary capacity for the use and benefit of the corporation.

*Id.* at 448 (quoting *Alvest, Inc. v. Superior Oil Corp.*, 398 P.2d 213, 215 (Alaska 1965)). In asserting that Ike breached his duty to utilize the asphalt plant for the benefit of NMC, Douglas and C.J. apparently rely also on AS 32.05.200(b)(1), which provides in relevant part that:

> a partner, subject to ... any agreement between the partners has an equal right with the partners to possess specific partnership property for partnership purposes, but the partner has no right to possess the property for any other purpose without the consent of the partners.

Finally, in contending that Ike failed timely to provide the accounting requested by C.J. during the 1984 season, they cite *Coleman v. Lofgren*, 593 P.2d 632, 636 (Alaska 1979), in which we held that a partner has a fiduciary duty to other partners to disclose information concerning partnership affairs. AS 32.05.150 ("Partners shall provide on demand true and full information of all things affecting the partnership to any partner...."); *see also* AS 32.05.160(a).

All of the above are accurate statements of Alaska partnership law. However, we note that the Guthries fail to substantiate their allegations with supporting citations to evidence in the record. Our review of the record discloses that it contains evidence which, viewed in Ike's favor, supports the pertinent findings of the superior court. Given that the error asserted here essentially challenges those findings as clearly erroneous, we cannot set them aside based on a "definite and firm conviction on the entire record" that the superior court made a mistake.[29]

---

**28.** With respect to the specific expenses alleged to "reflect [Ike's] attempt to profit PPC at the expense of NMC," the court allowed only the amount not disputed by Douglas and C.J. with respect to cash payments to a private party for meals, credit card payments, and trucking rock. The court disallowed entirely the expenses for tanker rent, trailer rent, pick-up rent and meals for PPC crews cited by the Guthries as improp-

er. The court did allow the trucking plant expense (only one-quarter of which was disputed) and the hot water heater expense.

**29.** Concerning the particular allegations described above, the record indicates:

(1) Ike testified that he actually paid the amount of land rent alleged to be a misrepresentation and received no kickback, credit or

Regarding the Guthries' general allegations that Ike/PPC profited at the expense of NMC, both Ike and a PPC officer testified that PPC lost money in 1984 and on paving contracts carried over from 1984 to 1985.

In summary, the relevant evidence at trial consisted primarily of the parties' testimony and documentary records which they attempted to explain. The parties were obviously at loggerheads and the superior court was thus required to make at least implicit evaluations of the parties' credibility. Although the testimony supporting the findings related to the issue of Ike's alleged breach of fiduciary duty challenged here is largely Ike's, we cannot conclude that the superior court's findings on this issue were clearly erroneous.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.[30]

other benefit for having paid this amount after entering a lease agreement for the lesser amount on which the court based its rent award. His testimony alone, although somewhat contradictory, does not create an unmistakable impression of a deliberate attempt to mislead the Guthries or the court in this respect. Ike further testified: that he and Douglas had agreed on the terms for the loader rental; that the loader was not purchased principally for NMC's use (and NMC did not have money to fund the purchase) but for other PPC jobs and thus was purchased in PPC's name; and that part of the high rental amount was attributable to necessary repairs.

(2) Ike testified that the parties planned to meet at the end of the 1984 season to "get all of our bills together and ... go through it," and that an injury made it impossible for him to travel for the planned meeting. He testified that he did take steps to put together the NMC accounting information during the summer of 1984, and that he ultimately completed his share of the accounting prior to Douglas's completing his.

(3) Ike conceded that he did not check on obtaining the needed permits as C.J. had requested because work kept him too busy. He further indicated that Douglas knew of this situation, that he was unaware at the time whether Douglas had checked on the permits, and that subsequently he and Douglas agreed to operate the plant despite the lack of permits and pay the consequences.

(4) Ike's failure to operate the plant during 1985 has previously been discussed. As to his obligation to provide the security and insurance for the plant while in his possession as ordered by the court, the court apparently did not find Ike to be in contempt (after ordering him to show cause for his noncompliance), and its findings and conclusions ultimately laid no blame on Ike in this connection.

30. All parties have appealed the superior court's determination that each party should bear its own costs and attorney's fees, "neither party having prevailed as that term is used in Civil Rule 79 and Civil Rule 82." We conclude that the superior court did not abuse its discretion in determining that neither party prevailed. *Hutchins v. Schwartz,* 724 P.2d 1194, 1204 (Alaska 1986).