*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| RECREATIONAL DATA SERVICES, INC., | ) ) | Supreme Court No. S-15893 |
| | ) | |
| Appellant, | ) | Superior Court No. 3AN-11-10519 CI |
| | ) | |
| v. | ) | O P I N I O N |
| | ) | |
| TRIMBLE NAVIGATION LIMITED, a California corporation, | ) ) | No. 7162 – March 24, 2017 |
| | ) | |
| Appellee. | ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Catherine M. Easter, Judge.

Appearances: Susan Orlansky, Reeves Amodio LLC, Gavin Kentch, Law Office of Gavin Kentch, LLC, Anchorage, Josh Fannon, Law Office of Joshua Fannon, Palmer, and Greg Parvin, Law Office of Gregory S. Parvin, Wasilla, for Appellant. James N. Leik and Brian P. Samuelson, Perkins Coie LLP, Anchorage, and Daniel P. Elms, Bell Nunnally & Martin, LLP, Dallas, Texas, for Appellee.

Before: Stowers, Chief Justice, Fabe, Winfree, Maassen, and Bolger, Justices.

MAASSEN, Justice.

## I.    INTRODUCTION

Recreational Data Services, Inc. (RDS) is an Alaska corporation that attempted to develop and market a smartphone that would come preloaded with outdoor-oriented software. RDS pursued a partnership to advance the project with Trimble Navigation Limited, through one of its divisions, Trimble Mobile Computing Services (Trimble Mobile),[1] and Remington Arms Company. Remington withdrew from the project after about two years of research and review. Several months later Trimble Mobile left the project too — shortly before a different Trimble division, Trimble Outdoors, launched a similar product. RDS sued Trimble for misrepresentation, breach of contract, and breach of fiduciary duty, alleging that Trimble Mobile intentionally delayed RDS's project while sharing confidential information about it with Trimble Outdoors.

A jury agreed with RDS and awarded it $51.3 million in lost profits. The superior court, however, concluded that RDS had not proven the amount of lost profits with reasonable certainty and granted Trimble a judgment notwithstanding the verdict. RDS appeals. It argues that the superior court erroneously conflated the standards of proof for the fact of harm and the amount of damages and asks that the jury verdict be reinstated. Trimble responds that no reasonable jury could have found that RDS satisfied all elements of its claims.

We conclude that it was error to grant a judgment notwithstanding the verdict because a reasonable juror could conclude that RDS proved all elements of its

---

[1]    Trimble Navigation, the named party in this case, has two distinct divisions relevant here: Trimble Mobile Computing Solutions and Trimble Outdoors. In this appeal we refer to Trimble Navigation and its divisions collectively as "Trimble." We identify Trimble Navigation, Trimble Mobile, or Trimble Outdoors individually when the fact of the entity's separate existence is important to the context.

claims. We also hold, however, that the superior court was correct to conclude that RDS failed to prove any amount of lost profits to a reasonable certainty as the law requires. We therefore grant remittitur, directing the superior court to make an award of nominal damages and enter judgment for RDS.

## II. FACTS AND PROCEEDINGS[2]

### A. Facts

In 2008 Brian Feucht and his business partner, Jim Belz, came up with an idea for a "ruggedized" smartphone with a pre-loaded suite of applications (apps) designed for outdoors enthusiasts. They formed RDS to develop the product they envisioned.

In February 2009 RDS sent an executive summary to Trimble Outdoors introducing three suites of anticipated software: HuntZone, FishZone, and RecZone. RDS proposed that it would develop the software and Trimble would build the phone's hardware. RDS received a positive response from Chaur-Fong Chen, the Director of Strategic Business Development for Trimble Mobile, a different Trimble division, and in March 2009 Trimble Mobile and RDS signed a mutual nondisclosure agreement. The nondisclosure agreement stated the parties' purpose, defined confidential information, and restricted the disclosure of confidential information to parent companies, subsidiaries, and employees on a need-to-know basis. Trimble Mobile was the only Trimble entity to sign the nondisclosure agreement.

RDS approached Remington about doing the marketing for the planned smartphone. In September 2009 Feucht, Belz, and Chen met with Pat Boehnen, a Remington project manager and marketing director, in Copper Center to discuss how the

---

[2] The oral arguments in this case took place before an audience of students and teachers at West High School in Anchorage as part of the "Supreme Court Live" community outreach program.

project would move forward. They agreed that RDS would be responsible for software, Trimble Mobile for hardware, and Remington for marketing. They also discussed research responsibilities, potential revenue, and the sharing of profits. They called the plan that emerged from this meeting the "Copper Center Project." Feucht testified that Chen and Boehnen both advised him not to launch a stand-alone app before the smartphone was complete; this would protect future hardware sales and ensure that the hardware and software were integrated.

The parties dispute whether they had created a partnership at this point. Feucht testified that at the end of the Copper Center trip "we shook hands and we decided that we were going to be partners and we were going to push this project forward to fruition." But according to Trimble, the parties "agreed to explore a possible venture" but stopped short of forming a partnership. The parties do agree that they all understood they could leave the Copper Center Project at any time.

After the Copper Center meeting, Remington conducted two large-scale market research surveys to evaluate what features the phone needed and how much consumers would be willing to pay for it. Using this data, RDS, Trimble Mobile, and Remington generated profit and loss statements predicting the phone's sales and each party's role. The parties also developed a PowerPoint presentation which identified them as partners and which was presented to potential third-party investors, including AT&T, Eklutna Corporation, Symbian, and Janney Montgomery Scott. Around September 2010 RDS approached Paul Miller, a former Remington executive, about acting as the Copper Center Project's Chief Operating Officer. Miller joined the project as an informal consultant pending a final contract between the companies.

In October or November 2010 Remington signaled its intent to withdraw from the Copper Center Project. Also in November 2010 Chen alerted Feucht for the first time that Trimble Outdoors was working on a similar project with the retail chain

Cabela's, though Chen assured Feucht the two projects did not compete. Feucht traveled to Trimble's headquarters in December and met with Chen and Steve Wolff, a Trimble Mobile employee who had joined Chen in the Copper Center Project, to discuss how they could move forward without Remington. During this meeting Wolff wrote on a whiteboard a series of valuations and projected revenues based on information Feucht provided. RDS alleges that during this meeting Trimble Mobile offered to acquire RDS, but Trimble disputes this.

RDS and Trimble Mobile decided to investigate whether Cabela's would be willing to replace Remington as the Copper Center Project's marketing arm. Miller arranged for them to meet with Cabela's in March 2011. But Chen emailed Feucht and Miller on the day of the meeting to say that Trimble Mobile would not attend. On their way to the meeting Feucht and Miller stopped at a restaurant inside Cabela's, where they saw advertisements for Cabela's new phone apps — ReconHunt and ReconFish — which they testified were almost identical to the software suite RDS had envisioned. They went through with the Cabela's meeting but felt disheartened, and a few weeks later Cabela's declined to work with them.

### B. Proceedings

In September 2011 RDS sued Trimble, alleging various causes of action for breach of contract, fraud, and breach of fiduciary duty.[3] A jury heard the case in September 2014. RDS sought to prove through testimony and emails between Chen and other Trimble employees that Chen regularly conferred with Trimble Outdoors in violation of the parties' nondisclosure agreement and that Chen shared confidential information that Trimble Outdoors and Cabela's used to their advantage to create the

---

[3]     RDS's complaint also named Cabela's, AT&T, and Alascom as defendants. At the time of trial, Trimble was the only remaining defendant.

ReconHunt and ReconFish apps. RDS also alleged that Trimble Mobile delayed the release of RDS's product while it "strung RDS along through deceptive statements." Finally, RDS argued that Chen had misrepresented that the Trimble Outdoors project did not compete with the Copper Center Project. To prove damages, RDS relied on the profit and loss projections that RDS, Trimble Mobile, and Remington generated for the Copper Center Project and the whiteboard valuations Wolff created during their December 2010 meeting.

Trimble moved for a directed verdict mid-trial and at the end of trial. The superior court denied the first motion, concluding that the issue was "very close" but that there was room for diversity of opinion among fair-minded jurors when viewing the evidence in the light most favorable to RDS. The superior court denied the later motion "[f]or the reasons previously stated."

The jury then returned a verdict in favor of RDS on all claims, awarding it $38.5 million for intentional and negligent misrepresentation and $12.8 million for breach of contract and fiduciary duty; these numbers added up to 100% of Wolff's whiteboard valuation of the project. The jury declined to award punitive damages.

Trimble moved for judgment notwithstanding the verdict or a new trial, arguing that RDS had failed to prove the elements of its claims and that the damage award was not supported by reasonably certain evidence of lost profits. The superior court granted Trimble's motion, concluding that "reasonable persons could not differ in their judgment that RDS, an unestablished business, did not prove any amount of lost profits with reasonable certainty." The court therefore entered judgment in favor of Trimble.

RDS now appeals, contending that the superior court failed to view the evidence in the light most favorable to it as the non-moving party. RDS also contends that a judgment notwithstanding the verdict was inappropriate because if the amount of

the award could not be calculated with reasonable certainty, then RDS was nonetheless entitled to a judgment in its favor and, at a minimum, an award of nominal damages.

## III. STANDARD OF REVIEW

Whether there is sufficient evidence to support a jury verdict is a question of law we review de novo.[4] We assess "whether, after reviewing the full record presented to the jury in the light most favorable to the non-moving party, a reasonable juror could possibly find in that party's favor."[5]

## IV. DISCUSSION

The superior court erred in granting a judgment notwithstanding the verdict. As discussed in Section A, a reasonable juror could find, as this jury did, that RDS proved all elements of its claims for misrepresentation, breach of contract, and breach of fiduciary duty by a preponderance of the evidence. But as explained in Section B, although it was error to conflate the fact of harm and the amount of damages in granting the judgment notwithstanding the verdict, the court correctly concluded that RDS did not prove any amount of lost profits to a reasonable certainty. Remittitur for an award of nominal damages is therefore appropriate, as discussed in Section C.

### A. It Was Error To Grant A Judgment Notwithstanding The Verdict Because A Reasonable Juror Could Find That RDS Proved All Elements Of Each Of Its Claims By A Preponderance Of The Evidence.

In ruling on a motion for a judgment notwithstanding the verdict, a trial court must determine "whether, after reviewing the full record presented to the jury in the light most favorable to the non-moving party, a reasonable juror could possibly find

_____

[4]    *Cameron v. Chang-Craft*, 251 P.3d 1008, 1018 (Alaska 2011) (citing *L.D.G., Inc. v. Brown*, 211 P.3d 1110, 1117-18 (Alaska 2009)).

[5]    *Wiersum v. Harder*, 316 P.3d 557, 563 (Alaska 2013) (citing *L.D.G.*, 211 P.3d at 1117).

in that party's favor."[6]  Thus, the fundamental question we consider here de novo is whether the evidence viewed in the light most favorable to RDS "permits room for diversity of opinion among reasonable jurors."[7]

> **1.    A reasonable juror could find that Trimble Mobile misrepresented that the Trimble Outdoors applications did not compete with the Copper Center Project.**

To show fraudulent misrepresentation RDS was required to prove these elements:  "(1) a misrepresentation of fact or intention, (2) made fraudulently (that is, with 'scienter'), (3) for the purpose or with the expectation of inducing another to act in reliance, (4) with justifiable reliance by the recipient, (5) causing loss."[8]  The elements of negligent misrepresentation are essentially the same, except that instead of scienter the plaintiff has to prove the defendant's lack of "reasonable care when making the statement."[9]  Trimble challenges only whether RDS proved justifiable and actual reliance; our analysis of this element applies to both the intentional and the negligent misrepresentation claims.[10]

---

[6]     *Id.* (citing *Cameron*, 251 P.3d at 1017).

[7]     *Cameron*, 251 P.3d at 1017 (quoting *City of Delta Junction v. Mack Trucks, Inc.*, 670 P.2d 1128, 1130 (Alaska 1983)).

[8]     *Lightle v. State, Real Estate Comm'n*, 146 P.3d 980, 983 (Alaska 2006) (quoting RESTATEMENT (SECOND) OF TORTS §§ 525, 526, 531 (AM. LAW INST. 1977)).

[9]     *S. Alaska Carpenters Health & Sec. Tr. Fund v. Jones*, 177 P.3d 844, 857 (Alaska 2008) (citing *Bubbel v. Wien Air Alaska, Inc.*, 682 P.2d 374, 380 (Alaska 1984)).

[10]     *Anchorage Chrysler Center, Inc. v. DaimlerChrysler Corp.*, 129 P.3d 905, 915 (Alaska 2006) ("[A]ctual reliance and justifiable reliance are both prerequisites to claims of negligent and intentional misrepresentation . . . .").

### a. A reasonable juror could find that RDS justifiably relied on Trimble Mobile's misrepresentations.

A plaintiff who knows that a statement is false "cannot justifiably rely" on it.[11] Trimble argues that RDS knew that the ReconHunt and ReconFish apps developed by Trimble Outdoors competed with the Copper Center Project because Feucht emailed Chen on November 30, 2010, to say he was "very concerned" about the Trimble Outdoors project and its possible entry into the same market. Feucht ended the email by telling Chen, "I need to know we have a deal or I need another supplier."

Feucht testified that he sent this email the same day or the day after Chen first told him Trimble Outdoors was working with Cabela's on a product that "did not compete with the Copper Center Project." Feucht admitted that Chen never answered his email, but he testified that a month later, in December 2010, he traveled to Trimble Mobile's headquarters and met with Chen and Wolff "to reassess the project and move the project forward" in light of Remington's imminent departure. Feucht testified that he was again reassured by both Chen and Wolff that Trimble Outdoors' project "was totally different. And we shouldn't worry about it." A reasonable juror could find it more likely than not that these assurances were given and that Feucht accepted them. And Trimble identifies no evidence that Feucht learned of the specifics of ReconHunt and ReconFish or of their similarity to the Copper Center Project before March 2011, when he saw advertisements for the apps at the Cabela's restaurant.

---

[11] *Shehata v. Salvation Army*, 225 P.3d 1106, 1114 (Alaska 2010) (citing 2 DAN B. DOBBS, THE LAW OF TORTS § 474 (2001)); *see also* RESTATEMENT (SECOND) OF TORTS § 541 cmt. a (AM. LAW INST. 1977) ("Although the recipient . . . is not barred from recovery because he could have discovered its falsity . . . by investigating its truth, he is nonetheless required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.").

**b. A reasonable juror could find that RDS relied on Trimble Mobile's misrepresentations by acting or refraining from action.**

Trimble also argues that RDS failed to prove that it "relie[d] on [Trimble Mobile's] misrepresentation in acting or refraining from action."[12] To support this assertion Trimble cites Feucht's testimony that he realized in March 2011 that ReconHunt was "an absolute rip-off of my idea" but proceeded with the pitch to Cabela's while continuing to treat Trimble Mobile as a partner. Trimble argues that "there is no credible basis to conclude that RDS would have changed its position or done anything differently" if Trimble Mobile had admitted early on that the projects competed.

But Trimble's argument slights the period from December 2010 to March 2011. A reasonable juror could conclude that had RDS known by December 2010 that Cabela's and Trimble Outdoors were creating a competing product, it would have used the next few months to pursue a different hardware provider, would have considered launching a separate software application, or would have taken some other action rather than waiting for its next meeting with Trimble Mobile. The fact that RDS went ahead with the Cabela's meeting in March 2011 could indicate that RDS relied on Trimble Mobile's assurances until it was too late to shift gears. A reasonable juror could thus find that RDS proved by a preponderance of the evidence that it actually relied on Trimble Mobile's misrepresentations.

**2. A reasonable juror could find that Trimble Mobile breached the nondisclosure agreement by sharing financial information with Trimble Outdoors.**

The nondisclosure agreement signed by RDS and Trimble Mobile early in their relationship prohibited either party from disclosing "Confidential Information."

---

[12] RESTATEMENT (SECOND) OF TORTS § 537(a) (AM. LAW INST. 1977).

"Confidential Information" was defined in the agreement as "any information or material of a confidential or proprietary nature relating to the existing or prospective business . . . of a Party or Others" or relating to "the terms of a prospective business relationship." The agreement also required the parties to identify confidential information in their written communications by attaching a statement "such as '[name of Party] Confidential Information' or words of like meaning."

RDS argued at trial that Trimble Mobile breached the nondisclosure agreement by sharing confidential information with Trimble Outdoors, specifically the profit and loss statements prepared by RDS, Trimble Mobile, and Remington based on Remington's market research data. On appeal Trimble argues that the evidence at trial was insufficient to support a finding that the agreement was breached. Trimble contends (a) that Trimble Mobile did not disclose confidential information to Trimble Outdoors; (b) that RDS had not properly identified the project's profit and loss statements as confidential; and (c) that information shared by Trimble Outdoors was not covered by the nondisclosure agreement.

### a. A reasonable juror could find that Chen shared confidential information with Trimble Outdoors.

Trimble argues that RDS failed to prove that Chen improperly shared the profit and loss statements because Chen described the documents he shared as "the financials . . . from Remington" but never specified which documents those were. But a reasonable juror could rely on context to conclude that the documents Chen referred to included the profit and loss statements.

The parties' emails indicated that Chen received the profit and loss statements from Feucht on September 30, 2010; and Chen testified that on November 20 he forwarded financial data to Mark Harrington of Trimble Navigation and Rich Rudow of Trimble Outdoors. While cross-examining Chen on this subject, RDS's attorney

emphasized repeatedly that he was asking about "the market research data as it applied to the financials, profits and losses." Chen confirmed his earlier deposition testimony that what he forwarded to the other Trimble employees was "the financials that we got from Remington," but he equivocated as to whether it would have been appropriate for him to share the related profit and loss information with others in the Trimble organization. From this, a juror could reasonably conclude that the profit and loss statements from Feucht's September 30 email were included in the information that Chen forwarded to Harrington and Rudow.

Conversations between Chen and Rudow in April and October 2009 and September and November 2010 provide additional context for a jury finding that Chen shared confidential information with Trimble Navigation and Trimble Outdoors. Chen testified at trial that he told Rudow in April 2009 that the Copper Center Project "software might be good for his business." In October 2009 Chen emailed Rudow to say he was preparing a presentation for Remington, Cabela's, and AT&T that he would show Rudow later. In September 2010 Chen emailed Rudow to say that since Rudow had "been working on the Outdoor related market and ha[d] gained a lot of experience in user's adoption and carrier behavior, Steve [Berglund, the Trimble Navigation CEO,] suggested that we should work together to see if we can address the concerns he has on the [Copper Center] project." As part of their meeting, Chen said he would like "to go through the current business plan and ask for your advice on various issues." In October 2010 Chen emailed Rudow to set up a meeting "to go through the plan in person [because] there [is] quite a bit of confidential stuff that right now is not the time to send it through email[]." At trial Chen testified that he, Rudow, and Harrington met in November 2010 to discuss "[p]otential overlap" between the projects. As discussed above, the evidence supported a conclusion that Chen sent Rudow and Harrington confidential information from the Copper Center Project in preparation for this meeting.

Viewing the evidence in the light most favorable to RDS, a reasonable juror could find that it was more likely than not that Chen did disclose confidential information to Rudow and Harrington, neither of whom worked for Trimble Mobile. This was a violation of the nondisclosure agreement.

### b. Feucht's email properly designated the profit and loss statements as confidential.

Feucht's email transmitting the profit and loss statements contained this notice: "This email and any files transmitted with it are RDS . . . property, are confidential, and are intended solely for the use of the individual or entity to whom this email is addressed." Trimble argues that "[t]he boilerplate paragraph at the end of Mr. Feucht's email did not meet [the nondisclosure agreement's] requirements." But Trimble does not elaborate on how the language was deficient. And although Trimble describes it as "boilerplate," there do not appear to be any other emails from Feucht in the record that contain the same or similar language.

Whether the notice satisfied the demands of the nondisclosure agreement presents a question of law.[13] Our object in interpreting a contract "is to give effect to the reasonable expectations of the parties."[14] We do this by "look[ing] to the language of the disputed provision, the language of other provisions of the contract, relevant extrinsic evidence, and case law interpreting similar provisions."[15] We conclude that Feucht's notice did constitute "words of like meaning" under the nondisclosure agreement's

---

[13] *Herring v. Herring*, 373 P.3d 521, 528 (Alaska 2016) (citing *Cook v. Cook*, 249 P.3d 1070, 1077 (Alaska 2011) (observing that the interpretation of contract language is a question of law reviewed de novo on appeal).

[14] *Alaska Fur Gallery, Inc. v. First Nat'l Bank Alaska*, 345 P.3d 76, 98 (Alaska 2015) (quoting *Peterson v. Wirum*, 625 P.2d 866, 872 n.10 (Alaska 1981)).

[15] *Id.* (quoting *Peterson*, 625 P.2d at 872 n.10).

provision for identifying confidential information, as the notice identified the disclosing party and explicitly stated that the emails and file were confidential.[16] And Feucht did "affix or incorporate" the notice to the profit and loss statements when he attached the statements to an email describing the "files transmitted" as "confidential." This interpretation of the nondisclosure agreement's language seems straightforward, and Trimble directs us to no extrinsic evidence that would require us to interpret it differently. We therefore conclude that the profit and loss statements were properly designated as confidential under the nondisclosure agreement.

### c. The nondisclosure agreement protected the profit and loss statements.

Trimble contends that the "financials . . . from Remington" are not covered by the nondisclosure agreement because the agreement says "Confidential Information shall not include any information which . . . [i]s lawfully received, without obligation of confidentiality, by Recipient from Others." Trimble argues that the market research data were produced by Remington, who was not a party to the nondisclosure agreement, and that Trimble Mobile received "the financials" from Remington — an "Other."

But confidential information under the nondisclosure agreement is defined by the party that sent it, not the party that generated it. Trimble points to no evidence that Trimble Mobile actually received the profit and loss statements from Remington.[17]

---

[16]    The partners did not always use the nondisclosure agreement's language verbatim. A Product Alliance Agreement, for example, was marked "Confidential — for Internal Discussion Purposes Only," while the parties' joint Copper Center Project presentation was marked "Company confidential — do not distribute."

[17]    The origin of the profit and loss statements is not immediately apparent from the document used as an exhibit at trial, though at one point Trimble's attorney clarified: "[I]t is an email from Mr. Chen transmitting a document. That's true. The content, the substance of the attachment, the data that is in that attachment, is from Mr.

(continued...)

Rather, the evidence indicated that Chen, Boehnen, and Feucht each created individual profit and loss statements based on Remington's market survey data, and that Boehnen and Feucht then forwarded their statements to Chen, who consolidated the statements into a single file. A juror could reasonably find that the profit and loss statements were information that related to the purpose of the nondisclosure agreement — for "discuss[ion of] the terms of a prospective business relationship" — since they forecast RDS's and Trimble Mobile's contributions and success if the Copper Center Project progressed. And a juror could reasonably find that the profit and loss statements were "material of a confidential or proprietary nature relating to the . . . prospective business and/or technology of a Party" since they projected the financial performance of the Copper Center Project and revealed information about how the participants expected the project to play out. Because Trimble Mobile received the confidential information from RDS, the profit and loss statements were protected by the nondisclosure agreement.

### 3. A reasonable juror could find that Trimble Mobile breached its fiduciary duty as RDS's partner.

Trimble also contends that the superior court was correct to conclude that RDS's claim for breach of fiduciary duty was not supported by the evidence. Trimble argues that no reasonable juror could have found that Trimble Mobile and RDS were partners or that Trimble Mobile breached a fiduciary duty arising out of such a partnership.

#### a. A reasonable juror could find that Trimble Mobile and RDS were partners.

A legal partnership is defined by statute as "the association of two or more persons to carry on as co-owners a business for profit . . . whether or not the persons

---

[17](...continued)
Feucht."

intend to form a partnership."[18] This definition can be reduced to four "key elements": (1) there is associational intent; (2) there is co-ownership of the resulting business; (3) the partners are in business; and (4) the business is intended to make a profit.[19] "Whether a partnership exists . . . is normally a question of fact for the fact finder."[20] Parties' description "of [their] relationship as one of partnership or not is not controlling; their intent may be inferred from their actions."[21] The jury in this case was properly instructed that "[a] partnership need not be documented in writing" and could exist "whether or not the persons intend to form a partnership."

Trimble contends that the evidence did not support two of the key elements that define a partnership: associational intent and co-ownership of a business. Associational intent requires "an agreement to combine the [partners'] property, money, effects, skill and knowledge to carry out a business enterprise."[22] If there is no written partnership agreement, "the existence of a partnership must be proven by credible evidence,"[23] which may include " 'the transactions, conduct and declarations' of the

---

[18] AS 32.06.202(a).

[19] *Hall v. TWS, Inc.*, 113 P.3d 1207, 1211-12 (Alaska 2005) (citing *Chocknok v. State, Commerical Fisheries Entry Comm'n*, 696 P.2d 669, 675-76 (Alaska 1985)).

[20] *Parker v. N. Mixing Co.*, 756 P.2d 881, 887 n.11 (Alaska 1988) (citing *Peterson v. Prince*, 430 N.E.2d 297, 300 (Ill. App. 1982); *Pruitt v. Fetty*, 134 S.E.2d 713, 716 (W. Va. 1964)).

[21] *Id.* (citing *Greene v. Brooks*, 45 Cal. Rptr. 99, 102 (Cal. App. 1965); *Anderson Hay & Grain Co. v. Dunn,* 467 P.2d 5, 7 (N.M. 1970); *Taylor v. Lewis*, 553 S.W.2d 153, 158 (Tex. App. 1977)).

[22] *Hall*, 113 P.3d at 1211 (alteration in original) (quoting *Chocknok*, 696 P.2d at 675-76).

[23] *Id.* (citing 59A AM. JUR. 2D, *Partnership* § 90 (2003)).

parties."[24] Co-ownership of a business "is evidenced by shared management authority and profit-sharing."[25]

As for the factor of associational intent, Trimble relies on the testimony of Paul Miller, the project consultant, that "[t]here was not a final contract" among the parties and that there was not "some meeting of the minds and agreements between the principals." But Miller later clarified, "I believe [RDS and Trimble Mobile] were acting as partners. And in terms of meeting of the minds, I meant the final construct, the dates, the dollars, how that was going to be rolled forward . . . ." A reasonable juror was not required to interpret Miller's testimony that there was no "final contract" to mean that there was no associational intent.

Trimble also notes that a draft Product Alliance Agreement circulated by Remington expressly denied that a partnership existed. But only Remington signed that document. As RDS notes, a reasonable juror could conclude that the other parties ultimately did not sign it because they "did not want to be bound by a document that characterized their relationship as something other than a partnership"; and a reasonable juror could read the agreement's language, even if indicative of the parties' intent, in light of the other evidence that they *acted* as partners.

Rather than focusing on the labels the parties gave their relationship, the jury instructions asked whether, based on their conduct, "RDS and Trimble [Mobile] intended or did combine assets, knowledge, or abilities to carry out a business enterprise."[26] The jury heard testimony that RDS, Trimble Mobile, and Remington were assigned responsibilities in the Copper Center Project based on their respective skills and

---

[24]    *Id.* (quoting *Innes v. Beauchene*, 370 P.2d 174, 176 (Alaska 1962)).

[25]    *Id.* at 1211-12 (citing *Chocknok*, 696 P.2d at 675).

[26]    *See id.*, 113 P.3d at 1211 (quoting *Innes*, 370 P.2d at 176).

assets. A reasonable juror could also infer from their representations to third parties that the three entities intended to combine their resources. The presentation the parties used in such meetings labeled each of the three participants as a "partner," gave an estimate of each partner's pre-launch financial investment, and identified each partner's individual responsibilities.

As for the co-ownership factor, Trimble argues that no reasonable juror could find that a partnership existed because Feucht testified at trial that RDS, Trimble Mobile, and Remington did not agree to co-own a business together. But while Feucht testified that he would not classify their relationship "as co-owners of a business," he later explained his meaning in terms that differ from the legal definition: "I think co-owners of a business is — if we were going to form a separate corporation and have equity, versus a partnership where we are each contributing core pieces of the project." And Feucht conceded that he did not know how partnership was defined in the law. A reasonable juror could thus have discounted Feucht's layperson's view of the project's legal status and relied on other aspects of his testimony that were more consistent with the legal definition's requirement of co-ownership. And the jury had been instructed that the parties' intent to create a partnership was not determinative as to whether they had in fact done so; thus, even if Feucht had testified that the parties did not intend to co-own a business, a reasonable juror could still find that the parties acted as if they did intend to co-own a business, thus creating a partnership.

Furthermore, a juror who decided that RDS and Trimble Mobile intended to collaborate on the Copper Center Project could also reasonably conclude that they intended to co-own the resulting business. The parties had negotiated job duties, profit-sharing, and risks related not just to start-up but also to operations. Although the parties

never earned profits, the return of their investment in the Copper Center Project and any future revenue were contingent on the project's success.[27]

Viewing the evidence in the light most favorable to RDS, a reasonable juror could find by a preponderance of the evidence that RDS, Trimble Mobile, and Remington were partners.

### b.  A reasonable juror could find that Trimble Mobile breached its fiduciary duty of loyalty as RDS's partner.

Alaska Statute 32.06.404(b)(2) defines a partner's duty of loyalty as including the duty "to refrain from dealing with the partnership in the conduct . . . of the partnership business as or on behalf of a party having an interest adverse to the partnership."  RDS contends that Trimble Mobile violated this duty when it shared information with Trimble Outdoors in violation of the nondisclosure agreement and concealed what it was doing.  RDS argues that Trimble Mobile also "deliberately strung RDS along through deceptive statements, thereby protecting Trimble's ability to get to market first with its products and denying RDS the opportunity to gain first-mover advantage in marketing either standalone apps or a phone preloaded with a specialized suite of apps."  Quoting AS 32.06.404(e), Trimble responds that a partner does not violate its duty of loyalty "merely because the partner's conduct furthers the partner's own interest" and that Trimble Mobile did not share "partnership property" with Trimble Outdoors because the information in question was data produced by Remington, not RDS.  But we conclude that a reasonable juror could find that Trimble Mobile breached its fiduciary duty as a partner.[28]

---

[27]  *See Parker v. N. Mixing Co.*, 756 P.2d 881, 887-88 (Alaska 1988).

[28]  AS 32.06.404(b)(2).  Because we conclude that a reasonable juror could find that Trimble Mobile breached its fiduciary duty under this section, we do not discuss

(continued...)

A reasonable juror could find that the market research data produced by Remington and the corresponding financial information were partnership property: the material was specific to the Copper Center Project, it was produced in furtherance of the project, and there was evidence that RDS and Trimble Mobile contributed to its development — all three companies reviewed the market research questions and had the opportunity to change or refine them.[29] And Chen admitted at trial that he sent "some of the financial[s]" from the Copper Center Project to Harrington and Rudow, who were outside the nondisclosure agreement, and that the market research was sent to Trimble Outdoors and Cabela's. The jury also heard testimony that Trimble Mobile repeatedly reassured RDS that the Trimble Outdoors project did not compete with the Copper Center Project. A reasonable juror could thus conclude that Trimble Mobile's conduct — both in sharing partnership information with outside parties and in misrepresenting that the Copper Center Project and Trimble Outdoors's project did not compete with each other — was that of a "party having an interest adverse to the partnership."[30]

The jury also heard evidence that Trimble Mobile ceded important decision-making about the Copper Center Project to others in the Trimble organization who lacked the same incentive to promote the project. The jury heard testimony that it was not Chen but Rudow — in charge of Trimble Outdoors's competing project — who

---

[28](...continued) in any depth RDS's arguments that Trimble Mobile also violated AS 32.06.404(b)(1) & (3) and its obligation of good faith and fair dealing.

[29]    *See* AS 32.06.204 (explaining when property is partnership property); REVISED UNIF. P'SHIP ACT § 204 Authors' Comments, cmt. 8 (West 2015-16 ed.) ("Although internally generated assets may not literally fall within Section 204, its principles should apply at least by analogy.").

[30]    *See* AS 32.06.404(b)(2).

decided that Trimble Mobile would not attend the partnership's March 2011 meeting with Cabela's. The jury saw a series of emails involving Chen, Wolff, and Rudow from a few months later, in which Rudow reprimanded Chen and Wolff for approaching the Cabela's CEO with the Copper Center Project while Trimble Outdoors was also meeting regularly with Cabela's because it might "screw it up for all of us." Rudow then wrote that "Tom [Rosdale, Cabela's Vice President of Marketing,] didn't appreciate the hoop jumping he just completed to kill the RDS deal. It was unnecessary and Trimble was part of the problem." Larry Fox, Trimble Outdoors's main contact with Cabela's, testified that Rosdale contacted him because he was confused by the need to meet with different Trimble divisions. Although Rosdale and a Cabela's marketing manager both testified by deposition that they declined the Copper Center Project because Cabela's was "not a telecommunication company," a reasonable juror could find instead, based on this record, that the project was stymied by purposeful interference from Trimble Outdoors, with Trimble Mobile's acquiescence.

### 4. A reasonable juror could find that Trimble Mobile's actions were a legal cause of RDS's harm.

In granting judgment notwithstanding the verdict, the superior court relied on several facts to conclude that the Copper Center Project would not have succeeded regardless of Trimble's challenged conduct: that RDS had not secured contractual commitments from its partners or a wireless provider, that it had not raised the $6 to $8 million it had committed to raise before the product launch, and that it had not created a software prototype. Trimble points to these same facts on appeal to argue that RDS failed to prove legal causation for any of its claims. Trimble also argues that the Copper Center Project could not have built its product at an acceptable cost and that RDS failed to develop financial and sales projections that would have enabled the project to move forward. But construing the evidence in the light most favorable to RDS, we conclude

that a reasonable juror could find by a preponderance of the evidence that Trimble Mobile's conduct caused RDS to lose profits.

> **a. A reasonable juror could find that the hurdles faced by the Copper Center Project were not insurmountable.**
>
> > **i. A reasonable juror could find that the Copper Center Project could have found a marketing partner.**

The superior court noted that the Copper Center Project could never earn profits without a marketing and distribution partner, and that "RDS offered no proof that it had any firm leads on anyone to fill that role." Trimble now argues that the project would never have succeeded in replacing Remington, citing Feucht's testimony that "there was only one real logical partner once Remington was out, and that was going to be Cabela's, because they were the number one player in the industry." And Trimble contends that Cabela's declined to participate not because of Trimble's interference but because the project entailed "a huge outlay of cash with a high risk on a product that has a short shelf life." But there was evidence that Cabela's considered selling a similar app on a "ruggedized, shockproof, and waterproof" phone produced and designed by Casio around the same time it was approached by RDS. Viewing this evidence in the light most favorable to RDS, a reasonable juror could conclude that Cabela's *was* interested in marketing a ruggedized phone with preloaded apps but was diverted from the Copper Center Project by Trimble Outdoors's competing product.

There was also evidence that another marketing partner would have stepped up if Cabela's, for whatever reason, declined the opportunity. Project consultant Miller testified that, from his time as chairman of Freedom Group, he was personally familiar with "the big-box stores, you know, the Cabela's, the Bass Pros, the Gander Mountains, Sportsmen Warehouse, those folks. And the distributors who sold to smaller dealers. A lot of people in the industry." Miller testified that he had "the capability to bring in

another person to replace Remington, based on [his] historical contacts in this industry" — and that he had done just that by arranging the meeting with Cabela's. A reasonable juror could believe Miller's testimony and conclude that, although RDS saw Cabela's as the most logical replacement for Remington, it was more likely than not that Miller would have secured other meetings and eventually another marketing partner had the Copper Center Project not died so soon after the Cabela's meeting.

ii. **A reasonable juror could conclude that the Copper Center Project could have found a mobile carrier.**

Trimble also points to Chen's testimony that no carrier was likely to certify the phone, testimony it asserts was uncontested. The superior court had the same concerns, observing that RDS failed to secure a commitment from AT&T and "presented no evidence that any wireless service carrier ever committed" to the project.

But Miller, the project consultant, testified that he would not expect a carrier to commit while the Copper Center Project was still in its early stages. And although Chen testified that "certification [by a wireless carrier was] going to be an issue" because of problems with data and audio quality, a reasonable juror could conclude that the partnership would continue to improve its hardware until it could be certified for wireless use.

There was also evidence that a wireless carrier would have committed to the Copper Center Project once the project had a viable phone. Chen admitted that Feucht had "very impressive contact[s]" with wireless providers; Feucht did succeed in arranging a meeting with AT&T through "a prior relationship with" an AT&T vice president. Trimble highlights testimony from an AT&T executive that the carrier was not interested in the phone because it was a "niche opportunity," but AT&T was not the only wireless carrier on RDS's horizon, and the jury was aware that other "niche" phones existed and had found wireless carriers to support them. A reasonable juror could

conclude that the Copper Center Project would more likely than not have succeeded in finding a wireless carrier.

### iii. A reasonable juror could find that RDS could have secured pre-launch funding.

When granting a judgment notwithstanding the verdict, the superior court also noted — and Trimble emphasizes on appeal — that at the time Trimble Mobile withdrew from the Copper Center Project, RDS had not yet secured the money for its pre-launch financial commitment of $6 to $8 million. The superior court was concerned that RDS may have relied too optimistically on "Miller's assumption that he could secure capital 'easily,' " and Trimble adds "that RDS was rejected by the only funding source it ever met with." Trimble also argues that it would have been impossible for RDS to secure funds before the partners finalized some kind of contractual relationship.

A reasonable juror need not have found these arguments convincing. Feucht testified that RDS's financial contribution was earmarked for paying software engineers, that RDS "couldn't start building software until there was a hardware device," and that "[t]here wasn't a concerted effort on [RDS's] part" to raise the funds while the hardware was still in the design stage. The question the jury faced, thus, was whether RDS would be able to raise funds once the partners had formalized their relationship and developed a hardware prototype. A reasonable juror could accept Miller's testimony that $6 to $8 million was an attainable sum. Miller testified it was "not a lot of money to raise. You know, I have seen . . . projects with . . . less merit and less wherewithal that raised . . . north of $10 million by just, you know, contacting a number of high net worth individuals." He said he had "a Rolodex of both industry people and enthusiasts" who would be interested in investing in the Copper Center Project even if Trimble Mobile walked away. He testified about his experience as an executive who was currently "buying and selling companies" for Cerberus Capital, had served as chairman of

Bushmaster when it acquired Remington, had worked in telecommunications for two nationwide wireless companies, and had "negotiated a billion-dollar contract with NASA" for Lockheed Martin. A reasonable juror could conclude based on Miller's experience and expertise that RDS would more likely than not raise the funds it needed for pre-launch financing when it became necessary for it to do so.

> iv. **A reasonable juror could conclude that RDS could have hired engineers and developed a software prototype.**

The superior court also observed, and Trimble argues on appeal, that at the time Trimble Mobile withdrew from the project RDS had yet to hire software engineers or develop its software prototype. But again there was evidence of RDS's ability to perform these tasks when the time was right. Feucht testified at trial that he had been chief information officer, then chief executive officer, of a company at which he built software, was responsible for "all [of] the technology within the entire corporation," and managed software partners and expenses. He left that company to start his own software company. His work with those two companies was featured in a magazine for senior IT executives and in the Wall Street Journal. When he moved to Alaska he served as a consultant for local businesses and in one case "built a software system with myself and another engineer that did all the local route planning, scheduling, [and] maintenance of the machines" for a coffee delivery company. A reasonable juror could conclude that it was more likely than not that someone with Feucht's practical experience was capable of hiring software engineers for the Copper Center Project and that the software could be developed once the hardware existed to support it.

> **v.  A reasonable juror could conclude that the smartphone could have been built at an acceptable cost.**

Trimble argues that the smartphone's hardware could not satisfy consumer demands and that the final product would prove to be too expensive. According to Chen's trial testimony, the market survey data showed that consumers wanted a versatile phone that worked well in daily life while including such features as a satellite emergency locator, weather information, a ballistics calculator, and a laser rangefinder. Chen testified, however, that those features would likely interfere with the phone's performance and give it a bulky package. He also testified that initial cost estimates for the phone were about $1,200, with an $800 cost to the consumer if a wireless carrier subsidized the phone — an amount, according to the survey data, that was more than consumers were willing to pay.

However, the jury also heard testimony about other products similar to RDS's proposed smartphone that were affordable and technologically viable. For instance, the jury heard from a Cabela's marketing director that Casio had built a "ruggedized, shockproof, and waterproof" phone that Cabela's considered selling with preloaded apps. An expert for Trimble testified that several ruggedized phones had been produced since 2006; he also testified about existing phone apps that were "almost identical to what was being presented" by RDS, although not "all in one package" as RDS proposed. From this evidence that other, similar products had been created for market without the problems Chen identified, a reasonable juror could conclude that the Copper Center Project more likely than not could have produced a marketable product.

### vi. A reasonable juror could find that the Copper Center Project could have been realized despite the lack of exact financial and sales projections.

Another barrier to the success of the Copper Center Project, according to Trimble, was the lack of realistic financial and sales projections. Trimble notes RDS's own admission that the project could not go forward unless "all parties were comfortable with the projected financials." And, Trimble claims, the projected financials had not been sufficiently well established for two reasons: first, the "user adoption rate" of the proposed smartphone was unknowable; and second, the projection did not account for Remington's departure from the project. But a reasonable juror could reject Trimble's characterization of these unknowns as insurmountable barriers to the project's continued development or success.

Boehnen, Remington's project manager and marketing director, testified that although the actual user adoption rate for a novel product was "unknown" and "unknowable," he could calculate the Copper Center Project's user adoption rate based on the adoption rate for innovative products historically, using a simple projection model called "Robert's Adoption Curve." A reasonable juror could conclude from Boehnen's testimony that the project would have moved forward as he projected and that the risk of an otherwise "unknowable" user adoption rate was an acceptable one to partners dealing with an innovative product.

Also, although the project's financials were based on Remington's participation, a reasonable juror could conclude it was more likely than not that the project would have found a different marketing partner, as explained above, and that with a new marketing partner the project would have seen success similar to that estimated based on Remington's participation.

Since a reasonable juror could find that none of the hurdles identified by Trimble was insurmountable, a reasonable juror could find that RDS proved the element of causation for each of its claims by a preponderance of the evidence.

> **b.** **A reasonable juror could find that RDS's reliance on Trimble Mobile's misrepresentations caused RDS to lose profits.**

The superior court properly instructed the jury that to find for RDS on its claims of negligent and intentional misrepresentation, the jury needed to find by a preponderance of the evidence that RDS's reliance on Trimble Mobile's misstatements was a substantial factor in causing RDS's monetary loss. Trimble challenges the jury's causation findings on RDS's tort claims, contending that RDS did not prove it "would have taken a different course of action" enabling it to earn profits absent Trimble Mobile's misrepresentations about Trimble Outdoors's competing project.

In order to prove causation, RDS needed to demonstrate only that the misrepresentations caused *some* monetary loss. RDS concedes that the record does not support a finding that the Copper Center Project could have produced a marketable phone by March 2011 even if Trimble Mobile had been forthcoming about the competing project. But Feucht testified that Chen and Boehnen convinced RDS to hold off developing the software for an earlier launch "because they thought it was going to take away from the hardware sales." A juror could reasonably conclude that RDS could have spent the time between November 2010 and March 2011 developing competitive apps while it sought new partners for the later creation and launch of a ruggedized smartphone. Accordingly, a reasonable juror could find it was more likely than not that Trimble Mobile's misrepresentations prevented RDS from taking action that would have either delayed the launch of Trimble Outdoors's competing product or sent an RDS software product to market sooner — thus causing RDS to lose some profit.

**c.** **A reasonable juror could find that Trimble Mobile's breach of the nondisclosure agreement and breach of fiduciary duty caused RDS to lose profits.**

Trimble also contends that RDS failed to prove that it lost profits due to Trimble Mobile's breaches of contract and fiduciary duty. Trimble argues that RDS was unable to show how Trimble Outdoors used the market research data or profit and loss statements to speed up the release of its own apps, ReconHunt and ReconFish, or how the alleged breaches prevented RDS from achieving the "first mover" advantage by releasing the Copper Center Project smartphone first.

However, a reasonable juror could conclude that Trimble Outdoors used the confidential data disclosed by Chen. As RDS argues, the similarities between ReconHunt and HuntZone support an inference that Trimble Outdoors used RDS's ideas and accelerated ReconHunt's release once the Remington-generated data and the profit and loss statements showed that those "ideas would be hugely profitable." A reasonable juror could also conclude that Trimble Mobile delayed producing the hardware and persuaded RDS not to market its software separately in order to prevent RDS from competing with ReconHunt and ReconFish. And a reasonable juror could conclude that Trimble Mobile delayed its own departure from the partnership until it was too late for RDS to create even a competitive app on its own. Weaving these conclusions together, a reasonable juror could find that RDS more likely than not lost first-mover status to Trimble Outdoors because Trimble Mobile's breach accelerated the production of ReconHunt and ReconFish while delaying the Copper Center Project.

Trimble also argues it was unforeseeable that "it could be liable for lost future profits generated by a joint business" when the only formal agreement between the parties was the nondisclosure agreement, the limited purpose of which was to protect confidential information, not commit the parties to a joint profit-making venture.

Contract damages are recoverable only if foreseeable, and they are foreseeable when they follow from the breach "in the ordinary course of events, or . . . as a result of special circumstances . . . that the party in breach had reason to know."[31]  The nondisclosure agreement's stated purpose was "the protection and preservation of the confidential and/or proprietary nature of information" the parties disclosed to each other while they discussed "the terms of a prospective business relationship."  Even though the nondisclosure agreement itself did not create a partnership, the parties foresaw the possibility that a more formal business relationship would evolve from their agreement.  And even if there never was a partnership, it was reasonably foreseeable that RDS's prospective business would be damaged and any future venture related to RDS's ruggedized smartphone would lose profits "in the ordinary course of events" if Trimble Mobile divulged confidential information protected by the nondisclosure agreement; indeed, to prevent such harm was the agreement's fundamental purpose.  A reasonable juror could thus find it was foreseeable that RDS would be damaged if Trimble Mobile breached the nondisclosure agreement and that RDS was in fact damaged.

B.    **Although It Was Error To Grant A Judgment Notwithstanding The Verdict, The Superior Court Was Correct to Conclude That The Evidence At Trial Did Not Support The Damages Award.**

1.    **The judgment notwithstanding the verdict erroneously conflated the fact of damages and the amount of damages.**

In granting Trimble a judgment notwithstanding the verdict, the superior court found that because RDS "cannot prove lost profits with reasonable certainty, [RDS]

---

[31]    *Native Alaskan Reclamation & Pest Control, Inc. v. United Bank Alaska*, 685 P.2d 1211, 1219 (Alaska 1984) (noting that lost profits may be reasonably foreseeable "as a probable result of a breach" when the parties entered the contract "because [the loss] follows from the breach." (quoting RESTATEMENT (SECOND) OF CONTRACTS § 351 (AM. LAW INST. 1981))).

cannot prove its damages claim." RDS contends on appeal that the court's finding, and its decision to grant a judgment notwithstanding the verdict, resulted from the court's erroneous conflation of two different burdens of proof: the burden required to show that RDS suffered damages and the burden required to show the amount of those damages.

RDS correctly observes that the elements of a tort cause of action — including the *fact* of damages (i.e., the fact that the plaintiff suffered harm) — must be proven by a preponderance of the evidence;[32] the *amount* of damages is a separate factual issue that, in the case of lost profits, must be proven to a reasonable certainty, based on evidence that "afford[s] sufficient data from which the court or jury may properly estimate the amount of damages."[33] Because the fact of lost-profit damages and their amount are different issues, a plaintiff may fail to prove the amount of lost profits to a reasonable certainty even after having proved by a preponderance of the evidence that it was harmed.[34] This dichotomy is reflected in the Restatements of Contracts and Torts.[35]

---

[32] *Fernandes v. Portwine*, 56 P.3d 1, 5 (Alaska 2002) ("Preponderance of the evidence is the general burden of persuasion in civil cases." (citing *Addington v. Texas*, 441 U.S. 418, 423 (1979)).

[33] *Azimi v. Johns*, 254 P.3d 1054, 1065 (Alaska 2011) (quoting *Sisters of Providence in Wash. v. A.A. Pain Clinic, Inc.*, 81 P.3d 989, 1007 (Alaska 2003)).

[34] *See, e.g.*, *Geolar, Inc. v. Gilbert/Commonwealth Inc. of Mich.*, 874 P.2d 937, 943, 947 (Alaska 1994) (finding evidence sufficient to support jury finding that defendant breached its contract but reversing award of lost profits as "too speculative").

[35] *See* RESTATEMENT (SECOND) OF CONTRACTS § 352 cmt. a, illus. 2 (AM. LAW INST. 1981) (noting that recovery is limited to reliance or nominal damages if a plaintiff fails to prove lost profits with reasonable certainty); RESTATEMENT (SECOND) OF TORTS § 774A cmt. c (AM. LAW INST. 1979) ("Sometimes, when the court is convinced that damages have been incurred but the amount cannot be proved with

(continued...)

Here, the jury was correctly instructed on the difference between the proof required to show the fact of damages and that required to determine the amount of an award of lost profits. The instructions for finding intentional and negligent misrepresentation stated that "RDS must prove it is more likely true than not" that it suffered a monetary loss as a result of its reliance on Trimble Mobile's misrepresentation. For the contract claims, the instructions explained that the jury must find that it is "more likely true than not true that Trimble deprived RDS of a benefit of the contract." But the jury instruction for damages provided that "[i]f you decide in favor of RDS on any of its claims, you must *then* decide how much money, *if any*, will fairly compensate RDS." (Emphasis added.) The damages instruction also explained that the damages RDS sought — lost profits — had to be proven with reasonable certainty. The jury was thus correctly instructed that RDS could prevail on its claims by proving their elements by a preponderance of the evidence and yet receive no lost-profits damages, if the evidence did not support such an award to a reasonable certainty.

In granting a judgment notwithstanding the verdict, however, the superior court applied only the reasonable certainty standard when considering whether RDS lost profits as a result of the demise of the Copper Center Project. This was error, as it resulted in setting aside the jury's finding of liability based on the higher standard of proof for lost-profit damages.

### 2. The evidence did not provide a reasonably certain basis for an award of lost profits to RDS.

Although we conclude that the evidence was sufficient to allow a reasonable juror to find that RDS proved the elements of its causes of action by a preponderance of the evidence, we must also conclude that the superior court was correct

---

[35](...continued)
reasonable certainty, it awards nominal damages."); *id.* at § 912 cmt. c, illus. 1.

to find the evidence insufficient to show lost profits to a reasonable certainty. The jury was instructed that reasonable certainty meant it could "not award damages to RDS on the basis of speculation, guess, or conjecture." But there was nothing else on which the jury could base a lost-profits award in this case.

Alaska permits recovery of lost profits for a business that is yet to be established, but it holds new businesses to the same standard of proof as established businesses.[36] The plaintiff must provide "sufficient data from which the court or jury may properly estimate the amount of damages, which data shall be established by facts rather than by mere conclusions of witnesses."[37] In *Guard v. P&R Enterprises, Inc.*, we observed that courts have considered "the profit history from the plaintiff's similar business at a different location" and "the profit history from the business in question if it was successfully run by someone else before the plaintiff" in calculating a new business's lost profits.[38] In *Guard* we also held that a plaintiff may not "rely solely on statistical projections to prove lost profits."[39]

---

[36]     *See Guard v. P & R Enterprises, Inc.*, 631 P.2d 1068, 1072 (Alaska 1981).

[37]     *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 223 (Alaska 1978) (quoting *Levene v. City of Salem*, 229 P.2d 255, 263 (Or. 1951)), *disapproved of on other grounds by Native Alaskan Reclamation & Pest Control, Inc. v. United Bank Alaska*, 685 P.2d 1211 (Alaska 1984).

[38]     631 P.2d at 1072 (first citing *Standard Mach. Co. v. Duncan Shaw Corp.*, 208 F.2d 61, 64-65 (1st Cir. 1953); *Leoni v. Bemis Co.*, 255 N.W.2d 824, 826 (Minn. 1977); *El Fredo Pizza, Inc. v. Roto-Flex Oven Co.*, 261 N.W.2d 358, 364 (Neb. 1978); then citing *Gen. Elec. Supply Co. v. Mt. Wheeler Power, Inc.*, 587 P.2d 1312, 1313 (Nev. 1978)); *see also Sisters of Providencein Wash.*, 81 P.3d at 1007 (holding that expert testimony accompanied by the testimony of two doctors with similar practices and defendant's preliminary revenue estimates supported a finding of lost profits).

[39]     *Guard*, 631 P.2d at 1072 n.4 (citing *Whittier Fuel & Marine Corp.*, 577 (continued...)

RDS argues that *Guard* does not intend to exclude "all proof of damages based on any kind of forecast or prediction," because Alaska courts have since relied on the Restatement's analysis of lost profits. The Restatement notes that "damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like."[40] But RDS did not present any of these types of evidence at trial. It relied on two sources: the profit and loss statements generated from the Remington market research data following the partners' September 2009 meeting at Copper Center and the valuation sketched out on the whiteboard by a Trimble Mobile employee at the December 2010 meeting after Remington had announced its withdrawal from the project. The project also generated market surveys, but RDS did not use these to support its statistical projections; nor did it present evidence that its projections were corroborated by the experience of similar businesses. The jury appeared to base its verdict on the "whiteboard" numbers, which valued the project at $38.5 million assuming a "75% revenue goal"; extrapolating from this number to 100% of the project's revenue goals results in $51.3 million, the amount of the jury's verdict.

RDS argues that its evidence can be distinguished from the "statistical projections" we disapproved in *Guard* because Trimble Mobile helped develop and approve the profit and loss statements and generated the whiteboard valuation itself. RDS suggests we clarify that *Guard* "intended to disallow projections developed by the plaintiff alone, perhaps as part of an optimistic business plan or created specifically for trial." But projected profits are not more reliable simply because the defendant agreed

---

[39](...continued)
P.2d at 223 n.27)).

[40]    RESTATEMENT (SECOND) OF CONTRACTS § 352 cmt. b (AM. LAW INST. 1981).

with them at the time they were created; both parties may be equally detached from the economic realities on which the jury is required to base its award.[41]

Here, even assuming that a juror concluded that both parties *believed* the financial statements were realistic when they were created, RDS did not present sufficient evidence that the statements actually *were* realistic.[42] They were calculated using research based on Remington's customer base; with Remington gone, they provided at most a rough estimate for the phone's success, without accounting for how new partners, a new marketing strategy, and a new customer base might affect the project's actual profits.

As for the whiteboard valuation of projected revenues, RDS admits that "[e]xactly how the whiteboard figures were determined is not clear." RDS gave no explanation of how the figures calculated the cost of producing the smartphone, its retail value, or RDS's estimated expenses. Although we do assume, viewing the evidence in the light most favorable to RDS, that the whiteboard represents Trimble Mobile's valuation of RDS at the time and depicts the phone's expected profit, the numbers have no obvious factual basis, lack real-world corroboration from comparable sources, and cannot be said to show the amount of RDS's lost profits with reasonable certainty.

---

[41] *See Hernandez v. Sovereign Cherokee Nation Tejas*, 343 S.W.3d 162, 174 (Tex. App. 2011) (noting that hope, "even when that hope is realistic, is not enough for recovery of lost profits" and distinguishing a case in which testimony supporting projections included "actual data from operating casinos in calculations" (first quoting *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 280 (Tex. 1994); then citing *Bright v. Addison*, 171 S.W.3d 588, 602-03 (Tex. App. 2005))).

[42] *Cf. Geolar, Inc. v. Gilbert/Commonwealth Inc. of Mich.*, 874 P.2d 937, 946 (Alaska 1994) ("Because [plaintiff] had no prior experience with contracts of this size and complexity, its own estimates, offered without proof of how they were reached, are unreliable.").

Nor was there any other evidence supporting an award of lost profits. As an alternative to the jury verdict, RDS argues that it is entitled at least to an award of lost profits from sales of a stand-alone app, because a reasonable juror could conclude that RDS's and Trimble Outdoors's apps were strikingly similar, and Larry Fox of Trimble Outdoors testified that "the anticipated profit and loss" for Trimble Outdoors's apps in 2012 "should have [amounted to] about two to two and a half million." But Fox's explanation of how he reached these numbers indicates that they, too, were simply projections, based on "estimations of subscriber goals that we would have liked to have seen." Like the whiteboard valuation and the profit and loss statements, Trimble Outdoors's *hoped-for* profits for the stand-alone apps, without more, are not a sufficient basis for a damage award to RDS.[43] We are forced to conclude that, although the jury's verdict in favor of RDS is otherwise supportable, its award of damages must be vacated.

## C. RDS Is Entitled To Nominal Damages.

RDS contends that "[a]t minimum, because RDS proved that it was damaged, it was entitled to an award of nominal damages." We agree. Trimble objects to such an award, arguing that RDS waived it by failing to propose a nominal damages instruction at trial and that RDS failed to prove the damage element of its claims. Having rejected the latter argument in the preceding discussion, we also hold that the nominal damages claim is not waived.

In *Anchorage Chrysler Center v. DaimlerChrysler Motors Corp.*, we allowed an award of nominal damages even though that claim was raised for the first

---

[43]     *See id.* (suggesting the plaintiff could have offered "profits obtained by other contractors performing similar jobs"); *Guard*, 631 P.2d at 1072 n.4 (noting a plaintiff may not "rely solely on statistical projections to prove lost profits").

time on appeal.[44] The plaintiff sued for fraudulent misrepresentation but at a bench trial "failed to prove the extent and amount of damages."[45] The plaintiff's complaint had requested "declaratory relief, injunctive relief, and compensatory and punitive damages," but not nominal damages.[46] The defendant argued that the plaintiff waived its nominal damages claim because it raised the issue for the first time on appeal, but we rejected that argument.[47] Instead, we analyzed whether the new arguments were "closely related to the trial court arguments and 'could have been gleaned from [the] pleadings.' "[48] We concluded that the question of nominal damages was properly before the court because the complaint "raised the issue of [defendant's] misrepresentations and requested unspecified damages and additional relief."[49] We then determined that nominal damages were available for a claim of fraudulent misrepresentation where a party "proved that it did suffer a loss but was not able to establish the extent or amount of damages."[50] Since the plaintiff had proved it incurred losses when it replaced logos in reliance on the defendant's misrepresentations about expanding its business but failed to quantify the cost of doing so, we held that nominal damages were appropriate.[51]

---

[44]     221 P.3d 977, 990 (Alaska 2009).

[45]     *Id.* (quoting *Zok v. State*, 903 P.2d 574, 577-78 (Alaska 1995)).

[46]     *Id.* at 982.

[47]     *Id.* at 990.

[48]     *Id.* (alteration in original) (quoting *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985)).

[49]     *Id.*

[50]     *Id.* at 991.

[51]     *Id.* at 992.

In this case, RDS's complaint alleged breaches of contract and fiduciary duty and that it "suffered economic losses as a result of Trimble's breaches of contract in the amount of not less than $111,666,973.00, the exact amount to be proven at trial." The complaint also alleged that fraudulent and negligent misrepresentation each caused economic damages "in the amount of not less than $111,666,973.00, the exact amount to be proven at trial." RDS requested "an award of general, past and future economic and other direct damages in the amount to be proven at trial," "an award of indirect, special, consequential, exemplary, extraordinary, and/or punitive damages in the amount to be proven at trial," and "an award of damages for fraud in the amount, plus punitive damages in the amounts to be proven at trial." Finally, RDS requested "such other relief [as it is] entitled to under law."

Following *Anchorage Chrysler Center*, we conclude that RDS's nominal damages claim is properly before us despite RDS's failure to request an instruction on the issue. A right to at least nominal damages is closely related to the arguments made at trial and could have been gleaned from the pleadings, since RDS did request general damages in an "amount to be proven at trial" and "such other relief" to which it was entitled. Because RDS proved that it "incur[red] a pecuniary loss of undetermined amount" as a result of Trimble Mobile's conduct, it is entitled to nominal damages.[52]

## V. CONCLUSION

We REVERSE the superior court's grant of judgment notwithstanding the verdict. We GRANT REMITTITUR on the jury's award of damages for lost profits and REMAND for a determination of nominal damages.

---

[52] *Id.* at 991.